979 So.2d 125 (2007)
Steven Wayne HALL, Jr.
v.
STATE of Alabama.
No. CR-05-0452.
Court of Criminal Appeals of Alabama.
March 23, 2007.
Rehearing Denied May 11, 2007.
Certiorari Denied August 24, 2007.
*130 Maryanne Elizabeth Melko Prince, Montgomery (withdrew 9/5/2006); and Jacob M. Tubbs, Birmingham, for appellant.
Troy King, atty. gen., and Henry M. Johnson, asst. atty. gen., for appellee.
Alabama Supreme Court 1061182.
BASCHAB, Presiding Judge.
On August 13, 1993, the appellant, Steven Wayne Hall, Jr., was convicted of capital murder for the killing of Clarene Haskew. The murder was made capital because he committed it during the course of a burglary. See § 13A-5-40(a)(4), Ala.Code 1975. By a vote of 10-2, the jury recommended that he be sentenced to death. On September 3, 1993, the trial court accepted the jury's recommendation and sentenced the appellant to death. We affirmed his conviction and sentence, see Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999); the Alabama Supreme Court affirmed his conviction and sentence, see Ex parte Hall, 820 So.2d 152 (Ala.2001); and the United States Supreme Court denied his petition for certiorari review, see Hall v. Alabama, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002). This court issued a certificate of judgment on November 27, 2001.
On April 1, 2003, the appellant filed a Rule 32 petition, challenging his conviction and sentence. On May 28, 2004, he amended his petition. After the State responded, the circuit court conducted an evidentiary hearing and denied the petition.[1] This appeal followed.
The appellant raises several arguments, including claims that his attorneys rendered ineffective assistance during the proceedings. In reviewing the circuit court's rulings on the appellant's arguments, we apply the following principles:
"`"[T]he plain error rule does not apply to Rule 32 proceedings, even if the case involves the death sentence." Thompson v. State, 615 So.2d 129 (Ala.Cr.App. 1992).' Cade v. State, 629 So.2d 38, 41 (Ala.Crim.App. 1993), cert. denied, [511] U.S. [1046], 114 S.Ct. 1579, 128 L.Ed.2d 221 (1994).
"In addition, `[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.' State v. Tarver, 629 So.2d 14, 19 (Ala.Crim.App. 1993)."
Brownlee v. State, 666 So.2d 91, 93 (Ala. Crim.App.1995).
"To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) that his counsel's performance was deficient and (2) that he was prejudiced as a result of the deficient performance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
"`The appellant must show that his counsel's performance was unreasonable, *131 considering all of the attendant circumstances. . . . "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.'
"Duren v. State, 590 So.2d 360, 362 (Ala. Cr.App.1990), aff'd, 590 So.2d 369 (Ala. 1991), cert. denied, [503] U.S. [974], 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).
"When this court is reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Luke v. State, 484 So.2d 531, 534 (Ala.Cr.App.1985). The burden is on the appellant to show that his counsel's conduct was deficient. Luke.

"`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
"Strickland, 466 U.S. at 689, 104 S.Ct. at 2065-66. (Citations omitted.) Ex parte Lawley, 512 So.2d 1370, 1372 ([Ala.] 1987).
"Initially we must determine whether counsel's performance was deficient. We must evaluate whether the action or inaction of counsel of which the petitioner complains was a strategic choice. `Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable. . . .' Lawley, 512 So.2d at 1372. This court must avoid using `hindsight' to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance. Falkner v. State, 586 So.2d 39 (Ala.Cr.App.1991)."
Hallford v. State, 629 So.2d 6, 8-9 (Ala. Crim.App.1992).
"In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the prongs. Id. at 697, 104 S.Ct. at 2069. In fact, the Court explained that `[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' Id. We defer to this guidance and address the `prejudice' prong, for `[w]ith respect to the prejudice component, the lack of merit of [Thomas's] claim is even more stark.' Id. at 699, 104 S.Ct. at 2070."
*132 Thomas v. State, 511 So.2d 248, 255 (Ala. Crim.App.1987) (footnote omitted).
"Furthermore, to render effective assistance, an attorney is not required to raise every conceivable constitutional claim available at trial and on appeal. Holladay v. State, 629 So.2d 673 (Ala.Cr. App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994); McCoy v. Lynaugh, 874 F.2d 954, 965-66 (5th Cir.1989). Rather, counsel must be given some discretion in determining which claims possibly have merit, and thus a better chance of success, and which claims do not have merit, and thus have little chance of success. Heath v. State, 536 So.2d 142 (Ala.Cr.App. 1988); Smith v. Murray, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986); Engle v. Isaac, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)."
Davis v. State, 720 So.2d 1006, 1014 (Ala. Crim.App.1998).
"The purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992)('We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that `[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or `what is prudent or appropriate, but only what is constitutionally compelled.' Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)."
Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (footnote omitted.) Finally,
"[i]n Strickland [v. Washington, 466 U.S. 668 (1984)], we made clear that, to establish prejudice, a `defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id., at 694, 104 S.Ct. 2052. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."
Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).
The following facts, as set forth in this court's opinion on direct appeal, are helpful to an understanding of this case:
"The State's evidence tended to show that on December 15, 1991, Conecuh County sheriff deputies discovered the body of 69-year-old Clarene Haskew on the kitchen floor of her home in McKenzie. Haskew had been shot twice in the back of the head, severely beaten, and strangled. A neighbor telephoned Haskew's son after she went to Haskew's home and discovered that the telephone line had been cut and that the glass on the entry door had been broken. Dr. Gregory Price Wanger, a forensic pathologist employed by the Alabama Department of Forensic Sciences, testified that Haskew was alive when she was shot and when the blunt force injuries were inflicted; thus, it was impossible for him to conclude which injuries occurred first.

*133 "When her body was discovered, Haskew's home was in total disarray and a pentagon had been spray-painted on the kitchen cabinets. The words `Thunder Struck' were also spray-painted on the kitchen floor near Haskew's body. Silverware and an address book had been taken from the scene and Haskew's gray 1982 Ford LTD automobile was missing. A be-on-the-look-out ('BOLO') was issued for the car.
"On the day of the murder, Nellie Schad's home, which was about one-fourth mile from Haskew's home, was burglarized. A .38 caliber Rossi revolver and a .410 gauge shotgun were taken in the burglary. Forensic analysis matched one bullet removed from Haskew's body with the .38 caliber gun stolen from Schad's home on the day of the murder.
"As a result of the BOLO, police received information that the stolen automobile was parked outside Paula Shiver's house in Uriah. Paula Shiver was Hall's girlfriend. When deputies arrived at Shiver's residence they saw a Ford automobile matching the description of Haskew's stolen vehicle in Shiver's yard. One of the deputies approached the vehicle to verify from the license plate that the vehicle was Haskew's vehicle. After they verified that it was Haskew's car, the deputies knocked on Shiver's door. Paula Shiver answered the door and told the deputies that Hall and [Wayne Holleman] Travis[, Hall's codefendant,] were in the house. While Shiver talked with the deputies Hall and Travis fled on foot.
"The dog warden from Fountain Prison was called to assist in apprehending Hall and Travis. Dogs tracked the two to the Rocky Hill community. When they found Hall and Travis, deputies attempted to get them to surrender. After deputies fired gunshots into the air, both suspects used profanity; one of the two suspects yelled, `if it's going to be a shoot out, a shoot out it will be.' Deputies then shot in the direction of the suspects, wounding both Hall and Travis. Hall was shot in the upper thigh. While waiting for an ambulance, deputies searched Hall and recovered seven rounds of .38 caliber ammunition in Hall's front vest pockets. These bullets fit one of the guns stolen from Schad's house  the gun that was identified as the murder weapon. The deputies' search of Travis revealed that Travis had the keys to the stolen Ford in his possession. Also, numerous items stolen from Haskew's and Schad's houses were discovered in the Ford. The murder weapon was discovered in the Ford.
"Hall conceded at trial and at oral argument before this Court that he participated in the burglary of Haskew's house. His defense was that he did not know that Travis intended to kill Haskew."
Hall, 820 So.2d at 120-21.

I.
The appellant argues that the circuit court erred in denying his ineffective-assistance-of-trial-counsel claims. At the outset, we note that this court reviewed many of the underlying substantive claims for plain error on direct appeal and did not find that there was any plain error. Although previous caselaw had held that a finding of no plain error on direct appeal foreclosed a finding of Strickland prejudice in a Rule 32 petition, in Ex parte Taylor, [Ms. 1040186, September 30, 2005] ___ So.2d ___, ___ (Ala.2005), the Alabama Supreme Court stated:
"[W]e granted certiorari review only with respect to the issue whether a determination on direct appeal that there *134 was no plain error in the trial proceedings necessarily forecloses a determination of the prejudice required under Strickland v. Washington for a claim of ineffective assistance of counsel raised in a postconviction proceeding. This Court holds that it does not. . . .
". . . .
"The Court of Criminal Appeals' opinion erroneously concludes that a finding of no plain error on direct appeal automatically precludes a capital defendant from raising a claim of ineffective assistance of counsel in a postconviction proceeding.
". . . .
"Although it may be the rare case in which the application of the plain-error test and the prejudice prong of the Strickland test will result in different outcomes, a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under Strickland to sustain a claim of ineffective assistance of counsel. In determining whether to grant a Rule 32 petitioner relief on an ineffective-assistance claim, a court must examine both the plain-error and prejudice standards of review."
Thus, in examining the ineffective-assistance-of-counsel claims that are based on substantive claims that were previously reviewed for plain error, we will also apply the Strickland prejudice standard of review. Finally, we will affirm the circuit court's judgment denying a Rule 32 petition if it is correct for any reason. See Sumlin v. State, 710 So.2d 941 (Ala.Crim. App.1998).

A.
First, the appellant contends that his trial attorneys rendered ineffective assistance during the guilt phase of his trial.

1.
The appellant asserts that his trial attorneys rendered ineffective assistance because they did not ensure that he was present at all stages of his trial. Specifically, he alleges that he was not present for an in-chambers discussion after counsel moved for a judgment of acquittal based on the pathologist's testimony.
On direct appeal, this court stated:
"Hall next argues that the trial court violated his right to be present at every phase of the trial when the court conducted an off-the-record hearing outside his presence.
"Initially, we note that this issue was not brought to the attention of the trial court; thus, our review is limited to whether plain error occurred. Rule 45A, Ala. R.App. P.
"The record reflects that at the end of the State's case-in-chief defense counsel moved for a judgment of acquittal, arguing that there was a material variance in the indictment. The trial court stated:
"`The Court: I want to take a short recess. I would like to see counsel and my court reporter, with his notes of Dr. Wanger's [a pathologist] testimony, in my chambers.
"`(Whereupon, there was a short recess in the proceedings, following which the following occurred, to-wit:)
"`The Court: Let me note for the record that during the argument, the Court adjourned to chambers to listen to the tape of Dr. Gregory Wanger, made no rulings or took no action while in chambers. Counsel for the State and Defense did accompany me and were able to listen to the tape at the same time the Court did.'
"Initially, as the State notes in its brief to this Court, there is absolutely no *135 indication in the record that Hall was not present at this off-the-record conference. As this Court has often stated, `We will not predicate error on a silent record.' Maples v. State, 758 So.2d 1 (Ala.Cr.App.1999), citing, Foster v. State, 587 So.2d 1106 (Ala.Cr.App.), opinion extended after remand, 591 So.2d 151 (Ala. Cr.App.1991).
"Even if we were to assume that Hall was absent from this hearing, we would still conclude that no violation of Hall's constitutional rights occurred here. As this Court reiterated in Borden v. State, 769 So.2d 935 (Ala.Cr.App.1997):
"`Recently, in Ponder v. State, 688 So.2d 280 (Ala.Cr.App.1996), this court stated:
"`"`The court in Proffitt v. Wainwright, [685 F.2d 1227 (11th Cir.1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983)], acknowledged in a footnote that in Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), "which was a capital case, [the Court] stated the sixth amendment privilege of confrontation could `be lost by consent or at times even by misconduct.' Snyder v. Massachusetts, 291 U.S. at 106, 54 S.Ct. at 332." Proffitt v. Wainwright, supra, at 1257, n. 43. See also State v. Davis, 290 N.C. 511, 227 S.E.2d 97, 110 (1976) ("[t]he strict rule that an accused cannot waive his right to be present at every stage of his trial upon an indictment charging a capital felony, State v. Moore, 275 N.C. 198, 166 S.E.2d 652 (1969), is not extended to require his presence at the hearing of a pretrial motion for discovery when he is represented by counsel who consented to his absence, and when no prejudice resulted from his absence"). See also State v. Piland, 58 N.C.App. 95, 293 S.E.2d 278 (1982), appeal dismissed, 306 N.C. 562, 294 S.E.2d 374 (1982) ("[t]he [capital] defendant in this case has not demonstrated any prejudice to him by his absence from a part of the hearing. The evidence elicited was not disputed and there has been no showing that it would have been different had the defendant been present").
"`"`Thus, if the appellant's presence . . . would have been useless to [his] defense and if the [pretrial] hearing was not considered to be a "critical stage" of [his] trial, then we can find no error in the appellant's absence from the hearing.'"
"`688 So.2d at 285, quoting Harris v. State, 632 So.2d 503, 512 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (emphasis in Harris.) See also Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala. Cr. App. 1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996); Ex parte DeBruce, 651 So.2d 624 (Ala.1994); Burton v. State 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).'
"769 So.2d at 943.
"Since this Court released Borden we have had several occasions to address this issue and on each occasion we found no reversible error. See McWhorter v. State, 781 So.2d 257 (Ala.Cr.App.1999) (McWhorter's absence from initial qualifying of the jury venire was not reversible error); Sneed v. State, 783 So.2d 841 (Ala.Cr.App.1999), and Hardy v. *136 State, 804 So.2d 247 (Ala.Cr.App.1999) (Sneed's and Hardy's absence from in-chambers hearing concerning redaction of statements and in-chambers hearing concerning jury's request during deliberations for two video-recorders was not error). See also Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997) (Burgess's absence from two pretrial motion hearings, an in-chambers discussion with counsel and the victim's family during voir dire, and an in-chambers discussion with counsel about suspending Burgess's telephone privileges was not reversible error).
"Hall has not shown that he was prejudiced by his absence from this off-the-record discussion where his attorney was present. No error, much less plain error, occurred here.
Hall, 820 So.2d at 136-38 (footnote omitted).
Also, in its order denying the petition, the circuit court stated:
"Hall was granted an evidentiary hearing on the claims in his amended Rule evidence or argument in support of the claim at his Rule 32 hearing. . . . Rule 32.3 of the Alabama Rules of Criminal Procedure places the burden of proof squarely on the petitioner in a post-conviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. For that reason, this claim is denied."
(C.R. 650-51.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Because the appellant did not present any evidence in support of this allegation, he did not satisfy his burden of proving that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. See Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland. Therefore, he is not entitled to relief on this allegation.

2.
The appellant also asserts that his trial attorneys rendered ineffective assistance because they did not request a jury instruction on the lesser included offense of felony-murder. Specifically, he alleges that "the theory of defense presented at trial was that [he] went along with Mr. Travis in the robbery of a couple of houses in Mr. Travis's community, but that [he] never intended or even knew that Mr. Travis intended to kill the victim." (Appellant's brief at pp. 10-11.)
In its order denying the petition, the circuit court found:
"It is well-settled in the State of Alabama that a criminal defendant is not entitled to a jury instruction on a lesser included offense unless there is a rational theory, based upon the evidence presented, that would support such an instruction. See, e.g., Ex parte Myers, 699 So.2d 1285, 1291 (Ala.1997) ('A charge on a lesser, non-capital offense is required only when there is a basis in the evidence which provides a reasonable theory supportive of the charge.'); Roberts v. State, 735 So.2d 1244, 1252 (Ala. Crim.App.1997). A trial court cannot instruct the jury on a lesser included offense if there is no rational basis for a guilty verdict on that charge. See, e.g., Apicella v. State, 809 So.2d 841, 857 (Ala.Crim.App.2000).
"In affirming Hall's capital murder conviction and death sentence on direct appeal, the Alabama Court of Criminal Appeals stated the following:
"`The evidence showed that Haskew was shot twice in the head, beaten repeatedly, and strangled. There *137 was absolutely no evidence presented that would bring the murder into the definition of felony murder. The manner of the killing showed that the killing was not an `unintended' murder that would fall under the definition of felony murder.
"Hall, 820 So.2d at 139. This Court agrees with the finding of the Alabama Court of Criminal Appeals. Based on this Court's thorough review of the trial record and this Court's personal knowledge of the evidence presented at Hall's trial, this Court finds that Hall was not entitled to a jury instruction on felony murder because there was no rational theory, based on the evidence presented, that would have supported such an instruction.
". . . .
"If Hall's counsel had requested a jury instruction on felony murder, this court would have rejected that request for the reasons stated above. Because a request for a jury instruction would have been absolutely baseless, this Court cannot find that his counsel were ineffective for failing to request such a jury instruction. For that reason, Hall cannot satisfy either the deficient performance or the prejudice prong of Strickland v. Washington, 466 U.S. 668 (1984)."
(C.R. 652-55.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this allegation.

3.
The appellant further asserts that his trial attorneys rendered ineffective assistance because they did not renew their motion for a second change of venue at the end of the voir dire proceedings. The offense occurred in Conecuh County, and the trial was initially moved to Monroe County. Defense counsel filed a second motion for a change of venue, and the trial court took the motion under advisement pending the outcome of the voir dire proceedings. However, counsel did not renew the motion after the voir dire proceedings.
On direct appeal, this court stated:
"Hall argues that the trial court erred in not granting his second motion for a change of venue. The record reflects that on March 18, 1993, the trial court granted Hall's motion for a change of venue and transferred the case to Monroe County. The trial court noted that Hall's codefendant, Wayne Travis, had been tried and convicted of capital murder immediately before he granted the motion for a change of venue and that Travis's trial had received widespread publicity. Hall's trial was scheduled to begin on August 9, 1993, in Monroe County.
"On August 5, Hall filed a second motion for a change of venue, attaching an article that had appeared in the Monroe Journal on August 4, 1993. The article summarizes the facts surrounding Haskew's murder, indicates that Travis had been tried and convicted of capital murder for Haskew's death, and reports that Hall was on probation for three counts of burglary when Haskew was murdered. The newspaper on August 4, 1993, also contained a list of jurors who had been called for jury service, beginning on August 9. After hearing argument on the motion, the trial court took the motion under advisement pending the outcome of voir dire examination of the prospective jurors. After voir dire examination Hall did not renew his motion for a change of venue.
"As this Court has previously stated concerning a motion for a change of venue:

*138 "`"`A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).'
"`"Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994)."
"`Clemons v. State, 720 So.2d 961, 977 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999). "The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson [, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity." Slagle v. State, 606 So.2d 193, 195 (Ala.Cr.App.1992). "`Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.'" Whisenhant v. State, 555 So.2d 219, 224 (Ala. Cr.App.1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990) (citations omitted) (quoting Dannelly v. State, 47 Ala.App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971)).
"`"In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated `actual prejudice' against him on the part of the jurors; 2) when there is `presumed prejudice' resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir.1983)."
"`Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).'
"Samra v. State, 771 So.2d 1108, 1113 (Ala.Cr.App.1999).
"Here, there was extensive publicity surrounding the case when Hall and Travis were initially captured and charged with the murder of Haskew. The murder occurred in December 1991. As a result of the publicity surrounding their capture and the publicity surrounding Travis's trial in March 1993, Hall's case was moved to Monroe County; it was set for trial in August 1993. In support of the motion for a second change of venue, Hall attached only one article. That article had appeared in the Monroe Journal several days before Hall's trial was scheduled to begin. As the trial court correctly noted, the correct way to determine if the pretrial publicity had saturated the community was through voir dire examination of the prospective jurors. That is one reason for the extensive voir dire examination in this case.
"The thorough and sifting voir dire examination of the prospective jurors was conducted in panels of six and composes *139 approximately 10 volumes of the 48-volume record on appeal. It is clear from a review of the voir dire that the trial court went to great lengths to ensure that Hall had a[n] impartial venire from which to draw his jury. A total of 88 prospective jurors were questioned on voir dire. Of the 88 jurors, approximately 28% of the venire, or 25 jurors, indicated that they had seen or had read the article in the Monroe Journal. The majority of those jurors that had seen the article were struck for cause. The remaining jurors indicated that anything they had seen or had read about the case would not affect their ability to be impartial and that they could base their decision on the evidence presented at trial. There was absolutely nothing that suggested that the article `saturated' the community with prejudicial publicity; thus, Hall has failed to show that there was presumed prejudice.
"Neither has Hall proven that there was actual prejudice. Hall has not argued, and indeed the record would not support such an argument, that any of the jurors who were not struck for cause were not impartial. There has been no showing of actual prejudice. . . .
"The trial court committed no error in denying Hall's second motion for a change of venue."
Hall, 820 So.2d at 122-24 (footnotes omitted).
Also, in its order denying the petition, the circuit court stated:
"Hall was granted an evidentiary hearing on the claims in his amended Rule 32 petition, but he failed to present any evidence or argument in support of the claim at his Rule 32 hearing. . . . Rule 32.3 of the Alabama Rules of Criminal Procedure places the burden of proof squarely on the petitioner in a post-conviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. For that reason, this claim is denied."
(C.R. 658.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Because the appellant did not present any evidence in support of this allegation, he did not satisfy his burden of proving that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. See Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland. Therefore, he is not entitled to relief on this allegation.

4.
In addition, the appellant asserts that his trial attorneys rendered ineffective assistance because they did not challenge for cause Veniremember E.M., who indicated during the voir dire proceedings that, if someone committed a murder during a robbery, she would vote to impose the death penalty.
On direct appeal, this court stated:
"Hall next argues that the trial court erred in denying several of his challenges for cause. Specifically, he contends that the trial court erred to reversal in denying his challenges for cause of eight prospective jurors who, he alleges, indicated biases during voir dire examination. In his brief to this Court, Hall addresses only the failure to strike prospective juror E.M. because, he alleges, she stated that, upon a conviction for a capital murder, she would always vote for the death penalty.
"A review of the voir dire examination shows that this juror was confused about the judicial process in a capital case. Initially, she stated that she would vote for the death penalty. However, when *140 the court explained the concept of aggravating and the mitigating circumstances and the need to weigh them against one another, E.M. indicated that she was confused. In an attempt to clarify E.M.'s confusion, the trial court gave a detailed explanation of the law as it relates to aggravating and mitigating evidence and the weighing process that a jury in Alabama uses to determine a sentence in a capital case. After this explanation the following occurred:
"`The Court: Now would you automatically impose the death penalty or would you wait and weigh it?
"`[E.M.]: I would weigh 
"`The Court: Now either way is fine. You have a right to your opinion. If you feel like you would automatically impose the death penalty, that's perfectly okay to say yes.
"`[E.M.]: I think I'd wait and hear both sides  I'd do that.
"`The Court: Now this wouldn't have anything to do with whether or not he was guilty because you had already decided that at that point. You'd already be absolutely certain he was guilty, beyond a reasonable doubt, and to a moral certainty and you'd have already heard how bad the murder was so you'd know how bad it was at that point, could you still then weigh those aggravating and mitigating circumstances or would you want to just go ahead and automatically sentence the Defendant to death?
"`[E.M.]: I think I'd want to wait and hear the  the circumstances.
"`. . . .
"`[E.M.]: Like I say, I'd like to hear  I don't know anything about what happened. I don't know anything about that. I think I'd have to sit there as a jury to hear what they say before I really say that he would have to spend life without parole or either get the death penalty.'
"As this Court stated in Travis v. State, 776 So.2d 819, 867 (Ala.Cr.App. 1997):
"`"Even though a prospective juror may initially admit to a potential for bias, the trial court's denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law. Knop v. McCain, 561 So.2d 229 (Ala.1989); Siebert v. State, 562 So.2d 586 (Ala. Cr.App.1989), affirmed, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Perryman v. State, 558 So.2d 972 (Ala.Cr.App.1989). Only when a prospective juror's testimony indicates a bias or prejudice so fixed or deep-seated that that person cannot be impartial and objective must a challenge for cause be granted by the trial court. Knop, supra; Siebert, supra; Perryman, supra."
"`Ex parte Land, 678 So.2d 224, 240 (Ala.1996), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). See also Harrell v. State, 470 So.2d 1303 (Ala.Cr.App.1984).'
"E.M. indicated that she could follow the law. The trial court committed no error in failing to grant Hall's challenge of E.M. for cause."
Hall, 820 So.2d at 126-27.
Also, in its order denying the petition, the circuit court stated:
"Hall was granted an evidentiary hearing on the claims in his amended Rule *141 32 petition, but he failed to present any evidence or argument in support of the claim at his Rule 32 hearing. . . . Rule 32.3 of the Alabama Rules of Criminal Procedure places the burden of proof squarely on the petitioner in a post-conviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. For that reason, this claim is denied."
(C.R. 662-63.) The record supports the circuit court's findings and our findings on direct appeal, and we adopt them as part of this opinion. Because the appellant did not present any additional evidence in support of this allegation, he did not satisfy his burden of proving that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. See Rule 32.3, Ala. R.Crim. P., and Strickland. Therefore, he is not entitled to relief on this allegation.

5.
Finally, the appellant asserts that his trial attorneys rendered ineffective assistance because they did not properly litigate a Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), objection. Specifically, he alleges that the record shows that the reasons given for removing Veniremembers D.W., R.S., J.M., R.L., and M.C., who were black, were not supported by the voir dire examination and the veniremembers' answers on their questionnaires; that the prosecutor did not question Veniremembers H.F., F.H., R.S., A.C., and B.B., who were white and who supposedly expressed more serious reservations about the death penalty; and that his trial attorneys rendered ineffective assistance because they did not properly question and effectively challenge the prosecutor's reasons for striking these black veniremembers.
The prosecutor stated that he struck Veniremember D.W. because he
"stated, in his questionnaire, some reservations about the death penalty. For instance, he said that he didn't like the taking of a human life. And he  he had strong reservations, in direct questioning by the State, about the death penalty. He stated it would  in our opinion, a great reluctance to go along with the death penalty."
(D.A.R. 7229-30.)
In his questionnaire, in response to a question concerning his feelings about the death penalty, Veniremember D.W. stated that a person should pay if he takes another person's life. However, he later stated that he did not like taking human life, but that a person should pay if he takes another person's life, and that his beliefs were based on the Bible's teachings against killing. He further stated that a person should be imprisoned for life without the possibility of parole if he commits murder. Finally, during voir dire examination by the State, the following occurred:
"[PROSECUTOR: D.W.,] I noticed that in your response to some of the questions that you said you favored the death penalty, but, that you don't like the taking of human life, but, if he or she takes someone else's life, I feel they should pay for it. And that's based on your biblical beliefs?
"[VENIREMEMBER D.W.]: (Inaudible.)
"[PROSECUTOR]: All right. Do  do you understand the process the Judge explained and I went through earlier about how, just because you find a person guilty of capital murder that would not automatically mean they'd get the death penalty?

*142 "[VENIREMEMBER D.W.]: Yes.
"[PROSECUTOR]: All right. So, I ask you this question, if you found a person guilty of capital murder, would you be able to go through this weighing process, say have mercy on this person?
"[VENIREMEMBER D.W.]: Not give him the death penalty as far as the taking of someone['s] life, maybe life imprisonment 
"[PROSECUTOR]: You said in here you believe life imprisonment would be appropriate punishment, have you not? You believe that would be an appropriate punishment under certain conditions, isn't that true?
"[VENIREMEMBER D.W.]: Right.
"[PROSECUTOR]: So, you wouldn't vote for the death penalty all the time, would you?
"[VENIREMEMBER D.W.]: No."
(D.A.R. 6234-45.)
The prosecutor stated that he struck Veniremember R.S. because she
"stated, in direct questioning by the State, that she had strong reservations about the death penalty. She said that it would take a whole lot for her to vote for the death penalty. In the questionnaire that she filled out, she did not answer the question, direct question in the questionnaire about the death penalty, for what purpose does the death penalty serve. She wouldn't answer the question about what impression life without parole would have. She stated that she had extreme and strong reservations. And it was felt by us, for non-racial reasons, that she could not follow the law of Alabama and vote for the death penalty if the evidence so proved in this case."
(D.A.R. 7224-25.)
In her questionnaire, Veniremember R.S. did not answer many of the questions about the death penalty. Also, during voir dire examination by the prosecutor, the following occurred:
"[VENIREMEMBER R.S.]: Okay. You said you could vote the life  the life without and then, you know, about the death penalty?
"[PROSECUTOR]: You have those two choices  you might have those two choices, you may not. It may not ever get to that, but, it could get to that. Okay. If it got to that point, if that became your choice, what I'm asking you is if you had certain things that you had to consider, two sides to consider, things that you had to think about about the case and about the law that would cause you might maybe to vote for the death penalty in certain cases and other things that would cause you to vote the other way, for life without parole, can you do that? Can you weigh it out and consider both sides?
"[VENIREMEMBER R.S.]: I don't think so  I don't know.
"[PROSECUTOR]: Are you confused about the process?
"[VENIREMEMBER R.S.]: Right.
"[PROSECUTOR]: What about it confuses you?
"[VENIREMEMBER R.S.]: Okay. Now you're saying you can vote life without parole then the death penalty  the death penalty, I don't think so.
"[PROSECUTOR]: You don't think you  you don't like the death penalty, is that right?
"[VENIREMEMBER R.S.]: No.
"[PROSECUTOR]: You have some very strong reservations about it, is that right?
"[VENIREMEMBER R.S.]: Right.
"[PROSECUTOR]: So, what you're saying it would take  could you ever vote for the death penalty, you think?

*143 "[VENIREMEMBER R.S.]: I don't think so.
"[PROSECUTOR]: In your answers to the questionnaire you indicated that you said you could in certain cases, is that right?
"[VENIREMEMBER R.S.]: Right.
"[PROSECUTOR]: But, you think it would take a  would it take a lot for you to do that or is it just you could never do it?
"[VENIREMEMBER R.S.]: Take a lot.
"[PROSECUTOR]: But, you might could do it, is that right?
"[VENIREMEMBER R.S.]: Right.
"[PROSECUTOR]: All right."
(D.A.R. 6426-28.)
The prosecutor stated that he struck Veniremember J.M. because she
"was in one of the earlier panels that came in. She stated that she had real problems and reservations regarding the death penalty. And in answer to the question, what type of cases or offenses do you feel the death penalty should be imposed, she said, `I oppose this type of punishment.' In questioning by me, in regard to that issue, she said she would try to be open-minded, but, that she just didn't feel like she could go for the death penalty and that  that this would not bring back the killer  she said, `If you kill the [defendant], you're just as bad as the killer.'"
(D.A.R. 7227-28.)
In her questionnaire, Veniremember J.M. initially stated that she was "very open minded" about the death penalty and that the death penalty prevented or slowed down similar crimes. (D.A.S.R. 418.) However, she also stated that she opposed the death penalty and favored imprisonment for life without the possibility of parole. Finally, during voir dire examination by the State, the following occurred:
"[PROSECUTOR]: I notice on here in response to questions about the death penalty that you said that you oppose this type of punishment.
"[VENIREMEMBER J.M.]: (Nodding head affirmatively.)
"[PROSECUTOR]: Could you explain to me your feelings about that?
"[VENIREMEMBER J.M.]: To the death penalty?
"[PROSECUTOR]: Yes, ma'am.
"[VENIREMEMBER J.M.]: That's the electric chair?
"[PROSECUTOR]: Uh-huh.
"[VENIREMEMBER J.M.]: Well, I feel that a person really wouldn't be, you know, he kill a person, they just out of their misery. But, if they're put on row death  I mean on 
"[PROSECUTOR]: In prison?
"[VENIREMEMBER J.M.]: In prison, all, they are punished more. Now that's my opinion about it.
"[PROSECUTOR]: All right. The Judge just asked you a question about whether or not you would be opposed to the death penalty where you would not vote for it in any case. Are you saying there are cases you would vote for the death penalty?
"[VENIREMEMBER J.M.]: I have a very open mind, I have to think 
"But, I do oppose it, Your Honor.
"[PROSECUTOR]: Well, let me ask you this question: Is your opposition based on your  on religious conviction or just a personal feeling or  or what?
"[VENIREMEMBER J.M.]: Well, the Bible says thou shall not kill.
"[PROSECUTOR]: All right. So, it's based on a religious conviction, is that right?

*144 "[VENIREMEMBER J.M.]: Uh-huh.
"[PROSECUTOR]: All right. Is that conviction then to the point that if you sat on a trial and you were on a jury and you heard the evidence on the jury and the Judge explained the law to you and told you that if the decision ultimately came down to whether you recommended life without parole or the death penalty and you had to weigh certain factors, certain aggravating factors the law provides, and certain mitigating factors and the Judge explained all this to you, could you sit on that jury and weigh all those factors and consider whether or not you would recommend the death penalty, knowing that you have this conviction that you could not vote for the death penalty because of your religious conviction?
"[VENIREMEMBER J.M.]: Well, after hearing all the evidence, you know, from both sides, I can give a just opinion about it.
"[PROSECUTOR]: Okay. So, let me ask you this then: Could you listen to the evidence and the facts and  and are there certain cases that can come to mind to you in which you would vote for the death penalty?
"[VENIREMEMBER J.M.]: Maybe."
(D.A.R. 5409-11.)
The prosecutor stated that he struck Veniremember M.C. because,
"in her questionnaire and in her questioning by me as a juror, [she] stated that her choice in every single case would be life without parole. She did not indicate a willingness to  to follow the death penalty. And she just was  expressed reluctance throughout and even, finally, when pinned down, said that she just would take life without parole in every single case."
(D.A.R. 7222-23.)
In her questionnaire, Veniremember M.C. stated that she believed people should be punished and that cases that involved brutal killings or the killing of innocent children came to mind when she thought about the death penalty. However, she also stated that imprisonment for life without the possibility of parole was better than the death penalty, that she did not believe the death penalty should be imposed in any cases, and that no one should take a life. Finally, during voir dire examination by the trial court, the following occurred:
"[THE COURT: M.C.], do you have a fixed opinion against capital punishment so that you would refuse to impose the death penalty regardless of the evidence produced? Yes or no?
"[VENIREMEMBER M.C.]: Do I have a fixed opinion?
"THE COURT: Against capital punishment so that you would refuse to impose the death penalty regardless of the evidence produced? Are you so against capital punishment that you wouldn't impose it under any circumstances?
"[VENIREMEMBER M.C.]: No, I would have to have the evidence, hear the evidence first.
"THE COURT: Uh-huh. There are some circumstances that you would impose the death penalty?
"[VENIREMEMBER M.C.]: I would  I'd have to go by what the evidence is.
"THE COURT: Okay. Now, the last  the next question is: Do you have a fixed opinion in favor of capital punishment so that you would always impose capital punishment or the death penalty *145 regardless of the evidence produced if it were shown that the Defendant intentionally murdered a victim during a burglary?
"[VENIREMEMBER M.C.]: No. I would have to hear evidence.
"THE COURT: You would have to listen to evidence?
"[VENIREMEMBER M.C.]: Yes.
"THE COURT: Now if the Defendant is convicted of a capital offense and the case has progressed to the punishment phase can you follow the law of the State of Alabama and weigh the aggravating circumstances and the mitigating circumstances that are proved during the punishment phase before you determine whether to recommend death or life imprisonment without parole?
"[VENIREMEMBER M.C.]: Yes, I would  I could.
"THE COURT: Again, ladies and gentlemen of the jury, nothing that I say to you should indicate to you the right answer. If you have a different opinion, if, for example, you would always impose the death penalty, you need to tell us that. If you have an opinion that you would never impose the death penalty, you need to tell us that. If you have an opinion that you would follow Alabama law, you need to tell us that. There is no right or wrong answer. And I'm not looking for any particular answer. I don't care what your answer is as long as I know how you feel.
"Yes, ma'am.
"[VENIREMEMBER M.C.]: Okay. I don't know what questions this would answer, but, I'm against the death penalty.
"THE COURT: All right. You're basically against the death penalty? Would you refuse to impose it regardless of what kind of case it was?
"[VENIREMEMBER M.C.]: I just don't agree with killing, I mean, the death penalty. Everybody should be punished some kind of way, but, I don't go with taking another life.
"THE COURT: Let me ask you the first question one more time. And, like I say now, I'm not trying to change your mind. I mean, anything that you honestly feel in your heart is the right answer. I just want to be clear what it is and I know this is a very confusing subject and I know that you're being thrown against it like a ton of bricks, you know. And you just happen to be the first person on my list so you get picked on this afternoon.
"First question: Do you have a fixed opinion against capital punishment so that you would refuse to impose the death penalty regardless of the evidence produced, no matter how bad the crime was?
"[VENIREMEMBER M.C.]: Okay. Could I answer without saying yes?
"THE COURT: Yes.
"[VENIREMEMBER M.C.]: Well the way I feel, some  some things deserve the death penalty, but, I just don't go along the death penalty. I want something  I think it should 
"THE COURT: All right. You say that something  well, what I'm really asking you is, could you, as a juror, if the evidence justified it, vote to recommend the death penalty, in a bad, bad case?
"[VENIREMEMBER M.C.]: Bad case?
"THE COURT: Bad, bad, bad case. And I'm not saying this is a bad, bad, bad case. I'm just asking the question.
"[VENIREMEMBER M.C.]: I know. I would just have to have the evidence 

*146 "THE COURT: Are you telling me that there are some cases that are so bad that you would recommend death?
"[VENIREMEMBER M.C.]: I  I'm just against the death penalty  in some cases  in some cases.
"THE COURT: You know, some lawyers ask this question: Could you vote for the death penalty if your mother was killed? Not that you could serve on a jury in that circumstance, but, some lawyers ask that question.
"[VENIREMEMBER M.C.]: Well, I would answer it like this, taking their life wouldn't bring back my mother.
"THE COURT: All right. Now let me get it clear, are you telling me that there is no case that you would vote for the death penalty or some cases are bad enough where you could?
"[VENIREMEMBER M.C.]: I could 
"THE COURT: There are some cases that are bad enough where you could impose the death penalty?
"[VENIREMEMBER M.C.]: Could I give you an example of 
"THE COURT: Yes, ma'am.
"[VENIREMEMBER M.C.]: Well, say for instance you got somebody killing little children or mutilating their bodies and doing things to them, I just 
"THE COURT: And you would impose the death penalty or vote for it?
"[VENIREMEMBER M.C.]: Yes.
"THE COURT: Okay."
(D.A.R. 5638-46.)
In her questionnaire, Veniremember H.F. stated that she was undecided about the death penalty; that it would be appropriate in some cases; and that, in deciding whether to impose the death penalty, each case should be judged on its own merits. During voir dire examination by the trial court, she did not indicate that she had a fixed opinion for or against the death penalty and did not express any reservations about imposing the death penalty.
In her questionnaire, Veniremember F.H. stated that she had never really thought about the death penalty and had not formed any opinions about the death penalty and when it would be appropriate. However, she did somewhat agree that a person who intentionally kills another person should get the death penalty and indicated that planned murders came to mind when she thought about the death penalty. Subsequently, during voir dire examination by the trial court, Veniremember F.H. did not indicate that she had a fixed opinion for or against the death penalty and did not express any reservations about imposing the death penalty. Finally, she did not equivocate and clearly indicated, even after extensive questioning by defense counsel, that she would consider all of the circumstances before deciding whether to vote for imprisonment for life without the possibility of parole or death.
In her questionnaire, Veniremember R.S. stated that she thought the death penalty was appropriate in some cases and that the decision of whether to impose the death penalty should be based on the circumstances of each case. During voir dire examination by the trial court and defense counsel, she did not express any reservations about imposing the death penalty. Instead, she indicated that she did not have a fixed opinion and that she would consider all of the circumstances before deciding whether to vote for imprisonment for life without the possibility of parole or death.
In her questionnaire, Veniremember A.C. stated that she had mixed feelings about the death penalty, that it would be appropriate in some cases, and that the *147 decision of whether to impose the death penalty should be based on the circumstances of each case. Subsequently, during voir dire examination by the trial court, she did not express any reservations about imposing the death penalty. In fact, she indicated that she was in favor of the death penalty, but that she would consider all of the circumstances before deciding whether to vote for imprisonment for life without the possibility of parole or death.
In her questionnaire, Veniremember B.B. also stated that she had mixed feelings about the death penalty, that it would be appropriate in some cases, and that the decision of whether to impose the death penalty should be based on the circumstances of each case. Subsequently, during voir dire examination by the trial court, she did not indicate that she had a fixed opinion for or against the death penalty or any reservations about imposing the death penalty. Ultimately, the parties agreed to leave her on the venire.
The record supports the prosecutor's reasons for striking the black veniremembers in question. Also, contrary to the appellant's assertions, the white veniremembers in question did not express more serious reservations about imposing the death penalty than those the State struck.
Finally, the prosecutor stated that he struck Veniremember R.L.,
"one of the first jurors that we had in the panel. He stood up, in questioning, when we started the questioning, when the Court did the general questioning to start with and asked to be excused. He said he had heart trouble. He didn't want to serve on the jury. He expressed confusion when he came in the courtroom. He did state very strong opinions about the death penalty, but, we struck [R.L.] because of  of his initial unwillingness to want to serve and because of his age and general health condition, Judge. Primarily his health condition and his demeanor when we asked him the questions."
(D.A.R. 7236-37.)
When the trial court asked the veniremembers if they needed to be excused for any reason, Veniremember R.L. asked to be excused because he had a doctor's appointment the next day because he was sick. Also, during voir dire examination by the State, he stated that he had been sick for some time and was disabled due to "[h]ypertension and . . . a bad heart." (D.A.R. 5414.) Finally, when the trial court called all of the veniremembers into the courtroom for the parties to strike the jury, Veniremember R.L. appeared to be confused when the trial court gave its instructions as to where he should be.
The record shows that Veniremember R.L. asked to be excused and that he was confused when the trial court called the final veniremembers into the courtroom before the striking of the jury. Also, although the prosecutor mentioned age in passing when discussing his general health condition, it is clear that his concern was about the veniremember's health condition and not his age. Therefore, the record supports the prosecutor's reasons for striking Veniremember R.L., and the appellant's argument to the contrary is without merit.
The record does not establish that the prosecutor engaged in disparate questioning or disparate treatment of similarly situated black and white veniremembers. Cf. Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). In fact, it shows that the prosecutor questioned and struck four black veniremembers because of their opposition to or reservations about the death penalty. Also, with regard to some of the veniremembers *148 challenged, additional questioning by the prosecutor was not necessary because the trial court had previously questioned them about their feelings concerning the death penalty. Neither the direct appeal record nor the Rule 32 record establishes a basis for any further challenge by the defense. Therefore, the appellant has not satisfied his burden of establishing that his trial attorneys rendered deficient performance in this regard and that this deficient performance prejudiced him. See Rule 32.3, Ala. R.Crim. P., and Strickland. Accordingly, even applying the prejudice standard as set forth in Strickland, he is not entitled to relief on this allegation.

B.
Second, the appellant contends that his trial attorneys rendered ineffective assistance during the penalty phase of his trial.

1.
The appellant asserts that his trial attorneys rendered ineffective assistance because they did not request a jury instruction that, if the aggravating and the mitigating circumstances were equally balanced, the jury must vote for imprisonment for life without the possibility of parole rather than death. In its order denying the petition, the circuit court found:
"Having thoroughly reviewed its penalty phase jury instructions, this Court is convinced that the jury instructions properly and clearly instructed the jurors that they could recommend a death sentence only if they first unanimously found the existence of an aggravating circumstance beyond a reasonable doubt and then found that the aggravating circumstance(s) outweighed the mitigating circumstance(s). (R. 8273-8318.) This Court instructed the jury as follows during the penalty phase of Hall's trial:
"`The law of this State provides that the punishment for the capital offense, for which you have convicted this defendant, is either death by electrocution or life imprisonment without eligibility for parole.'
"`Life imprisonment without parole means life imprisonment without parole. It is the law of this State that if you sentence the Defendant to life imprisonment, he will never be paroled. The law also provides that whether death or life imprisonment without parole should be imposed on the Defendant depends upon whether any aggravating circumstances are proved by the State, beyond a reasonable doubt, to exist and,  if so, whether the aggravating circumstances outweigh the mitigating circumstances.'
"`. . . .
"`In making your recommendation concerning what the punishment should be, you must first determine whether any aggravating circumstance exists, and, if so, you must determine whether any mitigating circumstance or circumstances exists.'
"`. . . .
"`If the jury is not convinced beyond a reasonable doubt based upon the evidence that one or more of such aggravating circumstances exists, imprisonment without parole . . . shall be imposed regardless of whether or not there are any mitigating circumstances in the case.'
"`. . . .
"`In order, to bring back a verdict recommending the punishment of death, you must unanimously find that at least one aggravating circumstance exists. If you find that the aggravating circumstance does exist, after such a discussion as the jury requires, another vote regarding the recommendation *149 of the jury as to the sentence can be made.'
"`. . . .
"`Now, ladies and gentlemen, if after a full and fair consideration of all the evidence in the case, you are convinced, beyond a reasonable doubt, that at least one aggravating circumstance does exist and you are convinced that the aggravating circumstance outweighs the mitigating circumstance, then your verdict would be, "We, the jury, having found by unanimous vote of all twelve jurors that at least one aggravating circumstance has been proved by the State and after weighing the aggravating and mitigating circumstances, do recommend that the Defendant, Steven Wayne Hall, be punished by death." Your foreman would annotate on this verdict form the vote, the number of votes for death here. The number of votes for life without parole here. That foreman would sign this verdict form and return it back to the Court.'
"`. . . .
"`Now, ladies and gentlemen, if after a full and fair consideration of all the evidence in the case, you are convinced, beyond a reasonable doubt, that at least one aggravating circumstance does exist and you are convinced that the aggravating circumstance outweighs the mitigating circumstance, then your verdict would be, "We, the jury, having found by unanimous vote of, all twelve jurors that at least one aggravating circumstance has been proved by the State and after weighing the aggravating and mitigating circumstances, do recommend that the Defendant, Steven Wayne Hall, be punished by death." Your foreman would annotate on the verdict form the vote on the left hand side, the votes for death, on the right hand side the votes for life without parole. He would then sign that verdict form and return it back to the Court.'
"(R. 8274-8278, 8310, 8313-8315, 8340-8341.) In sum, this Court repeatedly instructed the jurors that they could recommend death only if they found that the aggravating circumstance(s) outweighed the mitigating circumstance(s).
"Moreover, Hall misrepresents the Supreme Court of Alabama's holding in Ex parte Bryant, 951 So.2d 724 (Ala. 2002), in his amended petition. Hall alleges that the court, in Bryant, found that the trial court's penalty phase instructions constituted plain error because the court did not instruct the jurors that they could only recommend a death sentence if they first found that the aggravating circumstances outweighed the mitigating circumstances. Hall's reading of Bryant is incorrect. In Ex parte McNabb, 887 So.2d 998, 1003-1004 (Ala.2004), the Supreme Court of Alabama explained that the court's instructions in Bryant were erroneous because they created the impression that the jurors could recommend death even if they did not find the existence of any aggravating circumstances. Thus, Hall's reliance on Bryant is misplaced.
"In finding that the trial court's penalty phase jury instructions properly explained the process of weighing the aggravating and mitigating circumstances, the Alabama Court of Criminal Appeals in Lewis v. State, 889 So.2d 623, 690 (Ala.Crim.App.2003), emphasized that the trial court's instructions were `materially identical to those in the Alabama Proposed Pattern Jury Instructions for *150 Use in the Sentence Stage of Capital Cases Tried Under Act No. 81-178.' As shown above, this Court repeatedly instructed the jurors that they could not consider recommending death unless they first unanimously and beyond a reasonable doubt found the existence of an aggravating circumstance. This court further instructed the jurors that they could not recommend death unless they found that the aggravating circumstance(s) outweighed the mitigating circumstance(s). Thus, this court's instructions mirror the Alabama Pattern Jury Instructions and the jury instructions found to be adequate in McNabb and Lewis.

". . . .
". . . [B]ecause the instructions in this case mirror those of McNabb, Lewis, and the Alabama Pattern Jury Instructions, any objection to this Court's instructions would have been meritless. It is well-settled that counsel cannot be deemed ineffective for failing to raise a meritless issue at trial or on direct appeal. See, e.g., Bell, 518 So.2d at 847 ('Appellate counsel, however, is not obliged to raise issues reasonably considered to be without merit.'); Magwood, 689 So.2d at 979 ('None of the issues in Magwood's petition have merit and counsel cannot be ineffective for not raising meritless issues.'). Because any objection to this Court's instructions would have been meritless, Hall cannot satisfy either the deficient performance or the prejudice prong of Strickland v. Washington, 466 U.S. 668 (1984). This claim is, therefore, denied by this court."
(C.R. 673-79.) We agree with the circuit court's findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this allegation.[2]

2.
The appellant also asserts that his attorneys rendered ineffective assistance because they did not request a recess during the sentencing phase of the trial.
In his petition, the appellant simply alleged:
"Trial counsel failed to move for a recess during the sentencing phase and jury deliberations, despite the fact that the jury was in need of rest in order to fully consider Mr. Hall's mitigation evidence. During the penalty phase, the jury wrote a note to the trial judge asking to be excused for the day, because they were `physically and emotionally drained.' (R. 8238) Despite this request, the trial counsel continued with their presentation of mitigation evidence. The jury began deliberations on the penalty phase at about 7:30 that night. At 10:20 p.m., the Judge called a recess and for deliberations to begin at 10:00 a.m. the next morning. At no time did Mr. Hall's counsel ask the judge to end deliberations or to recess the mitigation hearing.
". . . Defense counsel should have asked the court for a recess before the start of deliberations.
Trial counsel were presenting evidence of mitigation in an attempt to save Mr. Hall's life. It was vital that they had an audience willing and able to hear them. The jury informed them that they were `drained.' Any evidence that defense counsel put on after receiving that note was not given the same and full attention it required. Trial counsel's failure *151 to request a recess so that the jury could rest and be able to consider fully their mitigation evidence constitutes ineffective assistance of counsel.
". . . The fatigue of the jury was so obvious that the trial judge ended deliberations for the day, remarking: `some of you (jurors) may be used to getting more sleep than you have been (during the trial).' (R. 8347) The deliberations continued long into the night because four of the jurors were holding out for life. They were also receiving heavy pressure from the others to change their minds, so that they could all get rest. Those who were for death got angry at those who were holding out for life."
(C.R. 338-39.)
In its order denying the petition, the circuit court found:
"This claim is summarily dismissed because it does not satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. . . . `Conclusory allegations not supported by specifics do not warrant relief.' Thomas [v. State], 766 So.2d [860] 889 [(Ala.Crim.App.1998)]. Rule 32.6(b) of the Alabama Rules of Criminal Procedure provides that `[a] bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.' As such, this claim fails to comply with the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. . . .
". . . Hall was granted an evidentiary hearing on the claims in his amended Rule 32 petition, but he failed to present any evidence or argument in support of this claim at his Rule 32 hearing. . . . Rule 32.3 of the Alabama Rules of Criminal Procedure places the burden of proof squarely on the petitioner in a post-conviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. For that reason, this claim is denied by this court."
(C.R. 679-81.) The record supports the circuit court's findings, and we adopt them as part of this opinion. The appellant made bare, conclusory allegations, and he did not present any evidence to support them during the evidentiary hearing. Therefore, he did not satisfy his burden of pleading and proof pursuant to Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland, as to this allegation. Accordingly, he is not entitled to relief on this allegation.

3.
The appellant additionally asserts that his trial attorneys rendered ineffective assistance because they did not present to the jury the testimony of several family members who allegedly could have presented mitigating evidence concerning his childhood. Specifically, he asserts that counsel should have called family members to testify before the jury during the penalty phase of the trial concerning his dysfunctional childhood and history of mental and emotional disturbances. He also appears to assert that his trial attorneys did not properly investigate mitigating evidence.
In its order denying the petition, the circuit court found:
"In his amended petition, Hall asserts that his trial counsel were ineffective for failing to ensure that his parents (Steven Wayne Hall, Sr. and Sharon Rodriquez Scott), maternal grandmother (Mildred Floyd), uncle (Doug Kitts), and aunt (Ann Kitts) were present at the penalty phase of his trial and for failing to call *152 them to testify on his behalf during that phase of his trial. (Amended Pet. at 42-47.) Hall concedes that those five people all testified on his behalf at his sentencing hearing before this Court. (Amended Pet. at 42-47.) Moreover, he fails to proffer any additional facts to which they would have testified if they had been called during the penalty phase of his trial. Instead, Hall briefly summarizes their testimony at his sentencing hearing and merely alleges that his trial counsel were ineffective for calling them as witnesses at his sentencing hearing instead of calling them during the penalty phase of his trial.
"In essence, Hall is alleging that his trial counsel should have done something more during the penalty phase of his trial  i.e., that they should have had the five people identified above attend the penalty phase of his trial and testify on his behalf. When a claim is raised that trial counsel should have done something more, the court must first look at what counsel did. Chandler [v. United States], 218 F.3d [1305,] 1320 [(11th Cir.2000)] ('Although Petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact.'). Moreover, `the mere fact that other witnesses have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.' Id. at 1316 n. 20. This Court will review his claim with that presumption in mind.
"As an initial matter, Hall's counsel, Attorneys Robert McMillan and Paul Brown, knew that there was a possibility that he would be convicted of capital murder, so they went to great lengths to prepare a penalty phase defense. For example, they filed a pre-trial motion entitled, `Motion to Allow Defense Counsel to Purchase at State Expense Capital Murder Case Litigation Aids for the Purpose of Development of the Defense of the Defendant,' which this Court granted, up to $100. (C.R. 64-65.) They used that money to purchase materials that would assist them in preparing both their guilt and penalty phase defense of Hall. For example, Mr. McMillan testified at Hall's Rule 32 evidentiary hearing that he and Brown obtained the manual on representing capital murder defendants that was prepared by Bryan Stevenson and other attorneys associated with the Capital Resource Center (now called `The Equal Justice Initiative of Alabama') and used that manual in preparing their defense of Hall. (E.H. 30, 32.) McMillan further testified that they obtained and used a disk containing legal documents and pleadings from the Capital Resource Center, and he recalled that the disk was `very helpful.' (E.H. 32.)
"In addition, they filed an `Ex Parte Application for Funds to Hire Mitigation Investigator,' which this Court granted. (C.R. 231-233.) Attorneys McMillan and Brown both testified that they used the money that was granted to them by the Court to hire a mitigation expert, Lucia Penland, to assist them in preparing for the penalty phase of Hall's trial. They also filed an `Ex Parte Motion to Provide Funds for Expert Psychiatric and Psychological Assistance,' which this Court granted, up to $2,000. (C.R. 240.) In their motion, they indicated that they would retain Dr. John Goff, a clinical psychologist and neuropsychologist, to evaluate Hall if their motion was granted, and they attached his curriculum vitae to the motion. (C.R. 240-254.) At the Rule 32 hearing, McMillan and Brown both acknowledged that they retained Dr. Goff and that he testified on *153 behalf of Hall during the penalty phase of the trial. (E.H. 25, 57.)
"In fact, Hall's trial counsel called five witnesses to testify on his behalf at the penalty phase of his trial. Those witnesses were, as follows: Ms. Lucia Penland (a mitigation expert); Mr. Mario Garcia (Hall's former teacher); Mr. Fritz Wiese (Hall's former step-father); Mr. Barry Synder (a social worker); and Dr. John Goff (a clinical psychologist and neuropsychologist). (R. 8017, 8105, 8107-8116, 8116-8137, 8137-8160, 8162-8236.) In total, their testimony spans approximately 200 pages in the record. This Court will now set forth a brief summary of each witness's testimony.
"Ms. Lucia Penland testified at length on behalf of Hall during the penalty phase of his trial. In fact, her testimony spans 88 pages in the record. (R. 8017-8105.) Ms. Penland testified that she is employed by the Alabama Prison Project, which is a prisoner advocacy organization that assists defense attorneys develop and prepare mitigation evidence in capital murder cases. (R. 8017-8018.) She was hired by Hall's counsel to assist them in developing mitigation evidence and preparing a mitigation defense for Hall. (R. 8018.) She testified that she has done the same type of work in three other death penalty cases and that, at the time of Hall's trial, she was working on developing mitigation evidence in five other capital murder cases. (R. 8070.)
"With regard to her work in Hall's case, Ms. Penland testified that she interviewed a number of Hall's family members. She traveled to North Carolina to interview his mother and sister, and she traveled to Florida to speak with his grandmother. (R. 8019.) She traveled to Dothan on several occasions to speak with his aunt, uncle, and cousins. (R. 8019.) In addition, she interviewed Hall, spoke with his attorneys about the case, and reviewed numerous records. (R. 8018-8019.) Based on her extensive research into Hall's history, Ms. Penland prepared and presented a time line chart to the jury, which was received into evidence as Defendant's Exhibits 9, 10, and 11. (R. 8020.) The time line chart contained photographs and highlighted significant events in Hall's life, by date, including his mother's multiple marriages, his moves, and the different problems he experienced from the time of his birth to right before he committed the crime for which he was charged. The chart was based on information provided to her by his mother, father, grandmother, uncle, aunt, cousin, and other people, including a former teacher (Mario Garcia) and one of his step-fathers (Fritz Wiese). (R. 8025-8026.)
"Ms. Penland testified extensively and in great detail about Hall's childhood. For example, she testified that Hall's mother (Sharon) divorced his father (Steven) when he was about 2 and ½ years old, partly because his father was an alcoholic and used marijuana in front of him and his sister (Michelle). (R. 8031-8033.) She further testified that his mother's second husband, Otis, did not want him and Michelle and tried to persuade her to abandon them. (R. 8039.) During the time that she was married to Steve and then Otis, Sharon frequently traveled from South Carolina, where she lived, to Florida to stay with her parents. (R. 8032.) Because she took Hall and Michelle with her on these trips, they did not have a stable home environment. According to Ms. Penland, Hall began having uncontrollable outbursts during this time period, but his mother did not take him to a psychologist or otherwise seek any counseling for him. (R. 8036-8041.)

*154 "Ms. Penland testified that Sharon married Fritz Wiese after she divorced Otis. (R. 8042.) Three or four months after their marriage, Fritz, who was in the military, was transferred to Guam, so he, Sharon, and the kids moved to Guam. (R. 8042.) About two years later, Sharon returned to Florida with Hall and Michelle and divorced Fritz. (R. 8043.) Several months later, she married Ricky McCall, although she had at least two live-in boyfriends between her marriage to Fritz and her marriage to Ricky. (R. 8043.) Ms. Penland testified that Ricky was a `violent' person who was both emotionally and physically abusive to Hall. (R. 8044.) She further testified that Ricky shot and killed Hall's German Shepard, and she explained that the death of his dog was extremely upsetting to Hall. (R. 8045.) Sharon's marriage to Ricky lasted 2 and ½ years, and she married another man, Lee Berry, after divorcing Ricky.
"According to Ms. Penland, Hall, during his preteen years, spent time living with Sharon and Lee Berry in North Carolina, Steve and his live-in girlfriend in Montgomery, Alabama, and his grandmother in Florida. (R. 8047-8050.) When he lived with his grandmother, Hall attended church regularly and was a member of a group called the Royal Rangers. (R. 8048.) But, his life was different when he stayed with Steve. When he was eleven years old, he lived with Steve for approximately three months. (R. 8049.) Ms. Penland testified that Steve and his girlfriend were alcoholics during this time period and that they did not provide him with a stable home life. (R. 8049.) In sum, Ms. Penland opined that Hall's pre-teen years were chaotic because he was constantly moving from one home to another and because his father's home in Montgomery was very unstable.
"Ms. Penland testified that Hall burned down his mother's house when he was fourteen years old. (R. 8054.) He subsequently was sent to a `Wilderness Camp,' where he had behavioral problems. (R. 8054.) He tried to run away from the camp and then attempted to kill himself, by hanging himself from a tent pole. After that incident, Hall was sent to a detention center and then a hospital for mental health treatment. (R. 8056.) Later, he was placed in a training school, where he received intensive counseling and earned his GED.
"Mr. Mario Garcia testified next during the penalty phase of Hall's trial. (R. 8107-8116.) He testified that he had been employed as a teacher in Florida for sixteen years and that he was Hall's fourth grade school teacher during the 1979-1980 academic year. (R. 8107, 8113.) He further testified that Hall stands out in his mind, partly because Hall's behavior changed for the better during the time that he was his teacher. (R. 8110.) Mr. Garcia recalled that when he called him down for misbehaving during the first week of class, Hall gave him a `very, very mean look' and stuck his tongue out at him. (R. 8110.) Based on this incident, Mr. Garcia initially assumed that he would be a `problem,' but he later realized that Hall just had a problem trusting adults. (R. 8111.) So, he did everything that he could to earn Hall's trust, including hugging him and otherwise showing him affection and letting him take the classroom hamster home. (R. 8111.) According to Mr. Garcia, Hall responded well to him. (R. 8112.)
"Mr. Fritz Wiese testified next during the penalty phase of Hall's trial. (R. 8116-8137.) He testified that he married Sharon when Hall was in kindergarten and that he was married to her for *155 about three years. (R. 8117.) At first, Hall was `standoffish' and apprehensive of him, so he tried to show him love by sitting close to him and hugging him. (R. 8123.) Eventually, Hall learned to trust him and showed affection for him. (R. 8125.) Mr. Wiese was aware that Sharon's marriage to Otis had been bad and that Otis had not treated Hall and Michelle well. (R. 8119-8120.) Knowing his background and the way he had been mistreated by people in the past, Mr. Wiese testified that he felt that Hall `needed an exorbitant amount of love and kindness and togetherness. He needed a strong male presence in his life.' (R. 8129.) Mr. Wiese testified that he tried to provide the love and affection that Hall needed, and he explained that he even wanted to adopt Hall, but did not do so because he did not want to affect the relationship that Hall was trying to build with his biological father, Steve. (R. 8129, 8132.)
"Mr. Wiese testified that the whole family received counseling when they lived in Guam. (R. 8122.) He stated that Hall responded well to the counseling and that he was able to develop a closer bond with him because of the counseling. (R. 8122-8123.) He further testified that Hall tended to let his emotions build up inside him and then erupt into a fit of rage, and he added that the counseling helped Hall learn how to control his temper and emotions. (R. 8123-8125, 8129.)
"Mr. Barry Snyder testified next during the penalty phase of Hall's trial. (R. 8137-8160.) Mr. Snyder testified that he is a social worker who primarily works with children and adolescents. (R. 8138.) According to Mr. Snyder, children develop the ability to trust others when they are two or three years old, and he explained that children who have problems developing a sense of trust typically have problems developing other faculties, such as self-esteem. (R. 8142.) He further explained that children who do not have a consistent environment may have trouble learning to trust others. (R. 8143.) In addition, he testified that children often respond to stress by either externalizing their feelings  such as by having outbursts  and that males typically externalize their emotions. (R. 8143.)
"Mr. Snyder testified that it is crucial to teach families, and especially parents, how to handle a child who is having emotional problems. (R. 8144.) He stated that parents can teach their child how to handle his or her emotions by being firm and consistent, such as by always sending the child to `time out' when he or she has an outburst and then explaining to the child why that punishment was imposed. (R. 8145-8147.) He emphasized that it is also important to teach parents how to impose discipline and shape a child's behavior by getting the child to think about the consequences of a given action. (R. 8148.) He agreed that inconsistent and brutal discipline has a negative effect on children. (R. 8148.)
"Based on his review of Hall's psychiatric records, Mr. Synder stated that Hall's childhood was not unlike that of the troubled children that he counsels. (R. 8140.) He opined that the records indicate that Hall tended to deal with his feelings by externalizing them, although he occasionally lapsed into periods of internalizing his emotions, during which he would feel bad about himself and lack confidence. (R. 8144.) He agreed that Hall's unstable childhood and the lack of consistency during his childhood had a negative impact on him and would have stunted his emotional development. (R. 8149.) Mr. Synder testified that he *156 could have helped Hall during his childhood if his parents had sought his help and agreed to work with him and follow his recommendations. (R. 8149.)
"Dr. John Goff was the last witness to testify during the penalty phase of Hall's trial. Dr. Goff's testimony spans approximately 74 pages in the record. (R. 8162-8236.) Dr. Goff testified that Hall's counsel retained him to conduct a mental examination of Hall. (R. 8166.) Dr. Goff further testified that he met with Hall on May 15, 1993, at the jail in Brewton. (R. 8166.) That meeting lasted approximately 3 and ½ hours. (R. 8170.) During his meeting with Hall, he conducted a clinical interview, administered two personality assessment instruments (the revised version of the Minnesota Multiphasic Personality Instrument and the Medical Multiaxial Inventory), and did a mental status examination. (R. 8166-8167.) Dr. Goff also testified that he reviewed Hall's records during the course of his evaluation. (R. 8167, 8171.)
"Based on his mental health examination of Hall, Dr. Goff diagnosed him with borderline personality disorder, which he characterized as a `very serious psychological disorder.' (R. 8172.) He testified that patients with that disorder have trouble controlling, restraining, and understanding their emotions, and he added that patients with a severe form of the disorder are prone to self-abuse, i.e., these patients cut, burn, and otherwise harm themselves and may attempt suicide. (R. 8173.)
"Dr. Goff testified that patients with borderline personality disorder tend to have trouble trusting other people, but he explained that when these patients do learn to trust someone, they will often `over-value' their relationship with that person. (R. 8193.) In other words, given their inability to control their emotions, these patients will `over-value' the relationships that they do manage to form, in the sense that they will `cling' or `glom' on to the other person and will be devastated if that person leaves them. (R. 8193-8194.) Dr. Goff further opined that people who have this disorder are not likely to be plotters or schemers, and he affirmed that patients with this disorder are more likely to be followers than leaders. (R. 8193.)
"With regard to Hall, Dr. Goff supported his diagnosis that he has borderline personality disorder by referring to Hall's social and mental health history. For example, he testified that Hall attempted to commit suicide by hanging himself at the age of fourteen and also attempted suicide while in custody awaiting trial on the charged offense. (R. 8173-8174.) He also testified that there are numerous reports of self-mutilation, `rage attacks,' and episodes of intense depression in Hall's records. (R. 8175.) He explained that borderline personality disorder `has a propensity to develop in individuals who have very chaotic and unstable environmental situations, particularly when they're real young,' and he agreed that Hall's chaotic childhood was consistent with that of other people who have this disorder. (R. 8177.) He affirmed that Hall's disorder is treatable, although he noted that it is much more effective to treat adolescents because the disorder usually manifests during childhood and worsens over time, which, according to Dr. Goff, is what happened in Hall's case. (r. 8190.)
"This Court finds that Hall has failed to demonstrate either deficient performance or prejudice with respect to his claim that his trial counsel were ineffective for failing to ensure that his parents, grandmother, uncle, and aunt were *157 present at the penalty phase of his trial and for failing to call them to testify on his behalf during that phase of his trial. For the following reasons, this claim is denied.
". . . .
". . . [B]ased upon this Court's review of the trial record and this Court's personal observation of his trial counsel's performance during the penalty phase of Hall's trial, this Court finds that they were effective. This Court finds that his counsel, McMillan and Brown, presented the jury with a wealth of mitigation evidence during the penalty phase of his trial.
"The five witnesses called by Hall's counsel during the penalty phase of his trial presented the jury with a vivid picture of his troubled childhood, his unstable home life, and his psychological and behavioral problems. Lucia Penland and Fritz Wiese testified extensively about Hall's chaotic childhood, and, in doing so, they made the jury aware that Hall was often neglected by his mother, father, and step-fathers and that he was physically and emotionally abused by several of his mother's lovers, including Ricky McCall. Their testimony, along with that of Mario Garcia and Barry Snyder, made it abundantly clear that, by the time he was in the fourth grade, Hall was in desperate need of parental love, attention, and guidance. In addition, Dr. Goff's testimony that Hall has been suffering from borderline personality disorder since his childhood provided the jury with an explanation for his history of psychological and behavioral problems. His testimony about borderline personality disorder  especially his testimony that people with the disorder tend to be followers, not leaders, and tend not to be planners or schemers  also provided the jurors with additional, and arguably compelling, mitigation evidence to consider.
"In fact, one of the jurors was so moved by the testimony of those witnesses that she testified on Hall's behalf at the sentencing hearing before this Court. At Hall's Rule 32 hearing, Mr. Brown testified that juror [R.T.] approached him after the penalty phase concluded, told him that she voted for life without parole, and volunteered to testify on Hall's behalf at the sentencing hearing. (E.H. 46, 58.0) [R.T.] did, in fact, testify at the sentencing hearing before this Court. She testified that, in her opinion, the evidence showing that Hall was neglected and abused was a big mitigating circumstance, and she asked this Court not to sentence him to death. (R. 8381-8385.)
"In sentencing Hall to death, this Court considered the evidence presented by his counsel during the penalty phase of his trial, including the testimony of Lucia Penland, Mario Garcia, Fritz Wiese, Barry Snyder, and Dr. John Goff. In its order sentencing Hall to death, this Court wrote, the following:
"`This Court has also considered, pursuant to § 13A-5-52, Code of Alabama, 1975, the evidence adduced by the defendant during the penalty phase of the trial regarding his character and record, particularly his history, his family life, and the emotional abuse suffered by the defendant during his childhood. The Court has considered as well the efforts to ameliorate his condition which was [sic] made by his parents, and the many attempts to rehabilitate him. The Court has considered the love of his step-father for him. The Court finds that these mitigating circumstances exist.'

*158 "For the foregoing reasons, this Court finds that Hall has failed to satisfy his burden of proving deficient performance with respect to this claim. This claim is, therefore, denied.
"Even if Hall could establish deficient performance with regard to this claim  which he clearly cannot  this Court would still deny this claim because he cannot prove prejudice. Hall's grandmother, uncle, aunt, father, and mother all testified during his sentencing hearing before this Court. (R. 8386-8397, 8397-8408, 8409-8425, 8425-8436, 8451-8468.) In his amended petition, Hall does not proffer any additional facts to which they would have testified if they had been called during the penalty phase of his trial. (Amended Pet. at 42-47.) Instead, Hall summarizes their, testimony at his sentencing hearing and alleged that his counsel were ineffective for presenting their testimony at his sentencing hearing instead of during the penalty phase of his trial.
"In his amended petition, Hall alleges that his father testified at his sentencing hearing that his home life was chaotic. (Amended Pet. at 43.) He alleges that his mother testified at his sentencing hearing that the family obtained and benefitted from counseling when they were in Guam but that she later discontinued the counseling, even though she was advised that Hall still needed counseling. (Amended Pet. at 44.) He alleges that his grandmother testified during his sentencing hearing that he was neglected and mistreated, that he had emotional problems, and that he was devastated when Ricky McCall killed his dog. (Amended Pet. at 45.) He alleges that his uncle testified at his sentencing hearing that he was neglected by his parents and was a follower. (Amended Pet. at 45-46.) Finally, he alleges that his aunt testified at his sentencing hearing that he was abused and neglected and that he was raised in an unstable environment. (Amended Pet. at 46-47.)
"Plainly, if his parents, grandparents, uncle, and aunt had testified during the penalty phase of his trial, their testimony would have been cumulative to the testimony that was presented by Lucia Penland, Mario Garcia, Fritz Wiese, Barry Snyder, and Dr. John Goff. Because their testimony would have been cumulative, this Court finds that it would not have altered the balance of aggravating and mitigating circumstances. There is no doubt that the outcome of this case would have been the same if Hall's counsel had presented the testimony of those five family members during the penalty phase of his trial. This Court finds that Hall has failed to satisfy his burden of proving prejudice. This Court, therefore, denies his claim on that basis as well."
(C.R. 683-707) (footnote omitted.)
In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court
"applied Strickland and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not `fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.' 529 U.S., at 396[, 120 S.Ct. at 1515] (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980))."
Wiggins v. Smith, 539 U.S. 510, 522, 123 S.Ct. 2527, 2536, 156 L.Ed.2d 471 (2003).
In Wiggins, 539 U.S. at 522-23, 123 S.Ct. at 2535-36, the United States Supreme Court stated:

*159 "[W]e therefore made no new law in resolving Williams' ineffectiveness claim. See Williams, 529 U.S., at 390[, 120 S.Ct. at 1511] (noting that the merits of Williams' claim `are squarely governed by our holding in Strickland'); see also Id., at 395[, 120 S.Ct. at 1514] (noting that the trial court correctly applied both components of the Strickland standard to petitioner's claim and proceeding to discuss counsel's failure to investigate as a violation of Strickland's performance prong). In highlighting counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as guides, we applied the same `clearly established' precedent of Strickland we apply today. Cf. 466 U.S., at 690-691[, 104 S.Ct. at 2066] (establishing that `thorough investigation[s]' are `[virtually unchallengeable' and underscoring that `counsel has a duty to make reasonable investigations']; see also Id., at 688-689[, 104 S.Ct. at 2065] ('Prevailing norms of practice as reflected in American Bar Association standards as the like . . . are guides to determining what is reasonable').
"In light of these standards, our principal concern in deciding whether [counsel] exercised `reasonable professional judgmen[t],' Id., at 691[, 104 S.Ct. at 2066], is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable. Ibid. Cf. Williams v. Taylor, supra, at 415[, 120 S.Ct. at 1524-25]. . . . In assessing counsel's investigation, we must conduct an objective review of their performance, measured for `reasonableness under prevailing professional norms,' Strickland, 466 U.S., at 688[, 104 S.Ct. at 2065], which includes a context-dependent consideration of the challenged conduct as seen `from counsel's perspective at the time,' Id., at 689[, 104 S.Ct. at 2065] ('[E]very effort [must] be made to eliminate the distorting effects of hindsight')."
Finally, in Rompilla v. Beard, 545 U.S. 374, 380-90, 125 S.Ct. 2456, 2462-67, 162 L.Ed.2d 360 (2005), the United States Supreme Court stated:
"Ineffective assistance under Strickland is deficient performance by counsel resulting in prejudice, 466 U.S., at 687, 104 S.Ct. 2052, with performance being measured against an `objective standard of reasonableness,' Id., at 688, 104 S.Ct. 2052, `under prevailing professional norms.' Ibid.; Wiggins v. Smith, supra, at 521, 123 S.Ct. 2527. This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation. In judging the defense's investigation, as in applying Strickland generally, hindsight is discounted by pegging adequacy to `counsel's perspective at the time' investigative decisions are made, 466 U.S., at 689, 104 S.Ct. 2052, and by giving a `heavy measure of deference to counsel's judgments,' Id., at 691, 104 S.Ct. 2052.
". . . This is not a case in which defense counsel simply ignored their obligation to find mitigating evidence. . . .
". . . .
". . . [A] further point is clear and dispositive: the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction.
"There is an obvious reason that the failure to examine Rompilla's prior conviction file fell below the level of reasonable performance. Counsel knew that *160 the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial. App. 665-666. There is no question that defense counsel were on notice, since they acknowledge that a `plea letter,' written by one of them four days prior to trial, mentioned the prosecutor's plans. Ibid. It is also undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried.
"It is clear, however, that defense counsel did not look at any part of that file, including the transcript, until warned by the prosecution a second time. . . .
". . . .
"At the postconviction evidentiary hearing, Rompilla's lawyer confirmed that she had not seen the transcript before the hearing in which this exchange took place, Id., at 506-507, and crucially, even after obtaining the transcript of the victim's testimony on the eve of the sentencing hearing, counsel apparently examined none of the other material in the file.
"With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth's own readily available file on the prior conviction to learn what the Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay and to anticipate the details of the aggravating evidence the Commonwealth would emphasize. Without making reasonable efforts to review the file, defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the transcript, or whether there were circumstances extenuating the behavior described by the victim. The obligation to get the file was particularly pressing here owing to the similarity of the violent prior offense to the crime charged and Rompilla's sentencing strategy stressing residual doubt. Without making efforts to learn the details and rebut the relevance of the earlier crime, a convincing argument for residual doubt was certainly beyond any hope.
". . . .
"At argument the most that Pennsylvania (and the United States as amicus) could say was that defense counsel's efforts to find mitigating evidence by other means excused them from looking at the prior conviction file. Tr. of Oral Arg. 37-39, 45-46. And that, of course, is the position taken by the state postconviction courts. Without specifically discussing the prior case file, they too found that defense counsel's efforts were enough to free them from any obligation to enquire further. Commonwealth v. Rompilla, No. 682/1988 (Pa. Ct. Common Pleas, Aug. 23, 1996), App. 263-264, 272-273.

*161 "We think this conclusion of the state court fails to answer the considerations we have set out, to the point of being an objectively unreasonable conclusion. It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking. No reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging in the prior victim's testimony. Nor would a reasonable lawyer compare possible searches for school reports, juvenile records, and evidence of drinking habits to the opportunity to take a look at a file disclosing what the prosecutor knows and even plans to read from in his case. Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there. E.g., Strickland, 466 U.S., at 699, 104 S.Ct. 2052. But looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce.
"The dissent thinks this analysis creates a `rigid, per se' rule that requires defense counsel to do a complete review of the file on any prior conviction introduced, post, at 2475 (opinion of KENNEDY, J.), but that is a mistake. Counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case. The unreasonableness of attempting no more than they did was heightened by the easy availability of the file at the trial courthouse, and the great risk that testimony about a similar violent crime would hamstring counsel's chosen defense of residual doubt. It is owing to these circumstances that the state courts were objectively unreasonable in concluding that counsel could reasonably decline to make any effort to review the file. Other situations, where a defense lawyer is not charged with knowledge that the prosecutor intends to use a prior conviction in this way, might well warrant a different assessment."
(Footnotes omitted.)
During the evidentiary hearing, William Robert McMillan testified that he represented the appellant at trial and on direct appeal to this court and to the Alabama Supreme Court; that he initially represented the appellant by himself because the trial court was having difficulty finding another attorney to represent him; and that he eventually got Paul Brown from Mobile to help him represent the appellant. He also testified that he had been practicing law approximately nine years at the time of the appellant's trial; that this was his third capital murder case; and that criminal cases constituted about fifty percent of his practice.
McMillan testified that the trial court granted a "Motion to Allow Defense Counsel to Purchase at State Expense Capital Murder Case Litigation Aids for the Purpose of Development of the Defense of the Defendant and Other Good and Proper Purposes," a "Defendant's Ex Parte Application for Funds to Hire a Mitigation Investigator," and a "Defendant's Ex Parte Application for Funds to Hire a Mitigation Investigator"; that they purchased and used the Capital Resources Notebook Bryan Stevenson had prepared and a disk *162 that had forms on it; that they hired Lucia Penland as a mitigation expert to assist them in preparing for the penalty phase of the trial; and that they hired Dr. John Goff, a psychologist, to assist them. He also testified that he deferred to Brown with regard to the mitigation portion of the case; that he did not personally investigate any mitigation issues, but did review and become familiar with what Brown was doing with regard to mitigation evidence; that he and Brown met with and Brown interviewed all of the witnesses at some point; that Penland and investigator Randy Longcrier interviewed the witnesses initially, and they followed up to make sure everything was clear before the trial; and that he thought the meeting was before they picked the jury. Finally, he testified that he sat in on Travis' trial and observed the evidence against Travis and the appellant and that he was "intense in [his] representation of [the appellant]" (R. 39.)
During the evidentiary hearing, Paul Brown testified that he practiced law in Mobile; that he was hesitant to get involved in this case because of the distance involved; and that he agreed to assist McMillan in representing the appellant at McMillan's request. He also testified that he had been practicing law about twelve years at the time of the appellant's trial; that criminal cases constituted approximately fifty to sixty percent of his practice; that he had been involved in at least one hundred felony jury trials at the time of the appellant's trial; and that he had represented other capital murder defendants who had entered pleas to lesser offenses and had tried one other capital murder case.
Brown testified that he was primarily responsible for jury selection, the mitigation investigation, and the penalty phase; that they hired Lucia Penland, who worked with the Alabama Prison Project, as a mitigation expert, and that he met with her several times; that Penland investigated, located, and interviewed witnesses; and that he met with Penland afterward to get her impressions and tried to speak with and encourage people with whom Penland was having difficulty. Brown testified that they relied heavily on Penland to do the mitigation investigation and to get information for mitigation; that Penland prepared a thorough time line and explained the events in the appellant's life; that he relied on Penland to interview many of the witnesses for economical reasons because of financial limitations; that he overrelied on Penland to determine what needed to be investigated and who needed to be interviewed; and that, using Penland's assistance, he and McMillan decided which witnesses to call during the penalty phase.
Brown testified that he spoke to Goff, but not with family members, before the penalty phase before the jury; that he thought he met with the family members toward the end of the trial; that he may have spoken to some family members by telephone previously, but did not remember doing so; and that he believed he spoke with all of the witnesses before they testified. He also testified that he could not remember why the appellant's mother did not testify during the penalty phase before the jury, but that, in retrospect, he thought it would have been better for her to testify; that he did not remember why they did not call a lot of family members during the penalty phase before the jury; and that, "in retrospect, with more maturity and experience, [he thought] it would have been much better, absent some other considerations, which [he could not] recall, it would have been better to put live witnesses, either to follow up with [Penland's] testimony or before her testimony." (R. 57-58.) Finally, he testified that he was dedicated to the appellant.
*163 During the trial proceedings, private investigator Randy Longcrier submitted an itemized list of services that shows that he took statements from numerous witnesses, including family members; that he located or attempted to locate the appellant's school, institutional, legal, and medical records; that he searched for the appellant's previous employers; that he obtained newspaper articles about the offense; that he reviewed the court filed related to Travis; and that he met with Lucia Penland and McMillan. (D.A.C.R. 481-88.)
Clearly, this is not a case in which there was not a mitigation investigation. Rather, the record shows that Penland and her staff and Longcrier conducted an extensive investigation into the appellant's background and childhood; that counsel communicated with them concerning the investigation; and that counsel made the ultimate decision as to what mitigation evidence to present. The appellant appears to argue that counsel could not delegate the responsibility to investigate to a subordinate. We disagree.
"[I]t is neither unprofessional nor unreasonable for a lawyer to use surrogates to investigate and interview potential witnesses rather than doing so personally. See Harris v. Dugger, 874 F.2d 756, 762 & n. 8 (11th Cir.1989). In fact, we have criticized counsel in other cases for failing to utilize subordinates to conduct pre-trial investigation. See Henderson v. Sargent, 926 F.2d 706, 714 (8th Cir. 1991)."
Walls v. Bowersox, 151 F.3d 827, 834 n. 4 (8th Cir.1998). See also Callahan v. State, 24 S.W.3d 483, 486 (Tex.Ct.App.2000) (holding that "[a] defense attorney is not required to investigate the facts of a case personally. Counsel may delegate the investigation to a private investigator"). Finally, when discussing the duty to investigate mitigating evidence in Rompilla, Wiggins, and Williams, the Supreme Court did not expressly or impliedly hold that counsel must perform the actual investigation. Therefore, we conclude that the appellant's trial attorneys did not render ineffective assistance when they relied on subordinates to conduct most of the mitigation investigation, communicated with them during the investigation, and made the ultimate decision about what mitigation evidence to present.
Likewise, we do not conclude that the appellant's trial attorneys rendered ineffective assistance by not calling the appellant's family members to testify during the sentencing hearing before the jury. We agree with the circuit court's findings in this regard, as set forth above, and we adopt them as part of this opinion. We also note that the trial record shows that the defense's strategy during the sentencing hearing before the jury was to argue that the appellant had been abandoned by his family and had a severe psychological disorder. In his penalty-phase opening statement, Brown stated:
"Listen to the testimony. What happened to Mrs. Haskew is bad. And it was equally bad what has happened to Steve during his life. Steve was born December 24, 1969. His mother, at that time, was sixteen years old. She was thirty-nine Thursday. The first day of trial was her birthday. And she won't be here today. She has chosen not to come nor will Steve's father be here. Both his parents, and I think it's indicative, and the evidence will show, that they don't care enough to come even to this proceeding, fully aware of what's going on.
"The evidence will show that right now Steve's mother and the other child, Michelle, are in North Carolina. And they refuse to come down here. Steve's *164 father, Steve Sr. has gone to South Dakota to a Harley-Davidson convention of some sort. He's not going to be here. We do have concerned people, but, not his parents. And I think that's what I was trying to get at when we spoke to you in the voir dire process about the need for parents to raise their children properly. And you're going to be presented with evidence as to that kind of need for a child."
(D.A.R. 7990-92.) Counsel presented evidence about the neglect the appellant suffered during his childhood through neutral third parties who did not have any reason to be biased in favor of him receiving a sentence of imprisonment for life without the possibility of parole. Also, the appellant's family members did testify during the sentencing hearing before the trial court.
In Ex parte Perkins, 941 So.2d 242, 249 (Ala.2006), the Alabama Supreme Court stated:
"[Petitioner] cites Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); and Ex parte Land, 775 So.2d 847, 853 (Ala.2000), all cases dealing with trial counsel's failure to properly investigate and present evidence indicating a defendant's dysfunctional family background. Those cases, however, involved trial counsel's complete failure to discover and present such mitigating evidence; they did not involve the question of whether counsel is ineffective if counsel chooses to present the mitigating evidence through expert testimony based on interviews with the defendant and his family members, instead of through objective documents."
(Emphasis added.) As one court has noted:
"[T]estimony from defendant's mother might have undermined defense counsel's attempts to portray her parenting as inadequate and defendant's childhood as troubled."
State v. Morton, 155 N.J. 383, 431-32, 715 A.2d 228, 252 (1998). "[F]amily members can be easily impeached for bias." Bergmann v. McCaughtry, 65 F.3d 1372, 1380 (7th Cir.1995).
We further note that
"[p]rejudicial ineffective assistance of counsel under Strickland cannot be established on the general claim that additional witnesses should have been called in mitigation. See Briley v. Bass, 750 F.2d 1238, 1248 (4th Cir.1984); see also Bassette v. Thompson, 915 F.2d 932, 941 (4th Cir.1990). Rather, the deciding factor is whether additional witnesses would have made any difference in the mitigation phase of the trial."
Smith v. Anderson, 104 F.Supp.2d 773, 809 (S.D.Ohio 2000), aff'd, 348 F.3d 177 (6th Cir.2003). "There has never been a case where additional witnesses could not have been called." State v. Tarver, 629 So.2d 14, 21 (Ala.Crim.App.1993). In this case, the testimony the appellant's family members presented during the sentencing hearing before the trial court was essentially cumulative to the testimony that was presented through other witnesses during the sentencing hearing before the jury.
Finally, we note that counsel's efforts to present mitigating evidence were so effective that one juror approached defense counsel and testified, during the sentencing hearing before the trial court, that the mitigating evidence was so compelling that she voted to impose a sentence of imprisonment for life without the possibility of parole.
*165 The record does not support the appellant's claims that his trial attorneys did not properly investigate and present mitigation evidence during the sentencing hearing before the jury. We are confident that, even if his family members had testified before the jury, the result would not have been different. Therefore, the appellant is not entitled to relief on this allegation.

4.
The appellant additionally asserts that his trial attorneys rendered ineffective assistance because they did not object to the trial court's jury instructions regarding mitigating circumstances. Specifically, he alleges: "Because the circuit court failed to instruct the jury that unanimity was not required to find a mitigating circumstance, and instead improperly indicated that such a finding needed to be unanimous, [he] was prejudiced." (Appellant's brief at p. 43.)
On direct appeal, this court stated:
"Initially, Hall argues that the trial court's instructions concerning mitigating evidence implied to the jury that its findings as to mitigating evidence had to be unanimous. Specifically, he cites the court's use of the word `you' when giving his jury instructions.
"This jury instruction was not objected to at trial; thus, our review is limited to the plain-error doctrine. Rule 45A, Ala. R.App. P.
"This Court addressed a similar issue in Freeman v. State, 776 So.2d 160 (Ala. Cr.App.1999):
"`Freeman also contends that the trial court erred by failing to instruct the jury that its findings as to mitigating circumstances did not have to be unanimous. In failing to so instruct the jury, he says, the trial court implied that the jurors had to unanimously agree before they could find the existence of a mitigating circumstance. Freeman did not object at trial to the trial court's instructions to the jury concerning mitigating circumstances; therefore, we will review this claim under the plain error rule. Rule 45A, Ala. R.App. P. We have reviewed the trial court's instructions to the jury; we find nothing in the instructions that would have suggested to the jurors, or given them the impression, that their findings concerning the existence of mitigating circumstances had to be unanimous. See Coral v. State, 628 So.2d 954, 985 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997).
"`As we stated in Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), in rejecting a claim identical to Freeman's:
"`"In Mills v. Maryland, 486 U.S. [367] at 384, 108 S.Ct. 1860, 100 L.Ed.2d 384 [(1988)], the United States Supreme Court held that a sentence of death must be vacated where `there is a substantial probability that reasonable jurors, upon receiving the judge's instructions . . . well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.' Again, no objection was made to the instructions in the trial court.
"`"Section 13A-5-45(g) provides:

*166 "`"`The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.'
"`"The instructions to the jury in the present case concerning the manner of establishing the existence of mitigating circumstances were in accordance with § 13A-5-45(g) and the Alabama Pattern Jury Instructions: Criminal. The jury was instructed that the appellant had the burden of interjecting a mitigating circumstance, but once it was interjected the state had the burden of disproving the factual existence of any mitigating circumstance by a preponderance of the evidence. The court gave no instruction suggesting that a finding of a mitigating circumstance had to be unanimous.
"`"The Alabama Supreme Court addressed this identical issue in Ex parte Martin, 548 So.2d 496, 499 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), and held that under the instructions given in Martin, `the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor.' For cases following Martin, see Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App. 1994); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). The instructions given in Martin are substantially the same as those given in the instant case. After reviewing the instructions in the present case in their entirety, we conclude that there is no reasonable likelihood or probability that the jurors believed or could have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating circumstance. The instructions were not only legally correct, but were clear and understandable. The case relied upon by the appellant, Mills v. Maryland, is factually distinguishable from the instant case. We find no merit in the appellant's contention, and no plain error in the instructions."
"`710 So.2d at 1307; see also Weaver v. State, 678 So.2d 260, 282 (Ala.Cr. App.1995), rev'd on other grounds, 678 So.2d 284 (Ala.1996).
"`Here, as in Williams, the jury was properly instructed that once Freeman offered a mitigating circumstance, the State had the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. No portion of the trial court's instructions suggested to the jury that its findings concerning mitigating circumstances had to be unanimous. Moreover, the trial court's instructions were in accordance with the Alabama Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried Under Act No. 81-178. After reviewing the trial court's instructions, we find that there was "no reasonable likelihood or probability that the jurors *167 believed that they were required to agree unanimously on the existence of any particular mitigating circumstance." Williams, 710 So.2d at 1307.'
"776 So.2d at 195-96. Use of the word `you,' without more, in relationship to a jury charge on mitigating evidence does not imply that the finding of a mitigating circumstance must be unanimous. Kuenzel v. State, 577 So.2d 474 (Ala.Cr. App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"The instruction did not imply that the finding of mitigating evidence had to be unanimous. There was no error, much less plain error, in the trial court's instruction on mitigating evidence."
Hall, 820 So.2d at 144-46.
Also, in its order denying the petition, the circuit court stated:
"Hall was granted an evidentiary hearing on the claims in his amended Rule 32 petition, but he failed to present any evidence or argument in support of this claim at his Rule 32 hearing. . . . Rule 32.3 of the Alabama Rules of Criminal Procedure places the burden of proof squarely on the petitioner in a postconviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. For that reason, this claim is denied."
(C.R. 733-34.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Because the appellant did not present any evidence in support of this allegation, he did not satisfy his burden of proving that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. See Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland. Therefore, he is not entitled to relief on this allegation.

5.
Finally, the appellant asserts that his trial attorneys rendered ineffective assistance because they did not object to the fact that the trial court mistakenly found in its sentencing order that he was 22 years of age at the time of the offense when he was actually 21 years of age. In its order denying the petition, the circuit court found:
"In this Court's order sentencing Hall to death, this Court found that the statutory mitigating circumstance pertaining to the age of the defendant at the time of the crime  section 13A-5-51(7) of the Code of Alabama (1975)  did not exist. In making that finding, this Court stated that Hall was 22 years old at the time of the offense. According to the pre-sentence investigation report, Hall was born on December 24, 1969. The murder of Clarene Haskew occurred on the night of December 14, 1991. Based on those facts, this Court agrees that Hall was 21 years old at the time of the offense. This Court notes, however, that Hall committed the murder of Clarene Haskew just ten days before his 22nd birthday.
"This Court was the sentencing court. This Court listened to all of the evidence presented during the guilt and penalty phases of Hall's trial and at his sentencing hearing and thoroughly considered all of that evidence. This Court also considered the arguments of counsel and the information contained in the presentence report, with the exception of the attachments to the pre-sentence report, which this Court did not consider.
"Based on this Court's review of the trial record and this Court's personal knowledge of the evidence that was presented during Hall's trial, this Court *168 finds that the fact that Hall was 21 years old at the time of the crime would not have changed this Court's finding that the statutory mitigating circumstance pertaining to the age of the defendant at the time of the crime does not exist in his case. As the Alabama Court of Criminal Appeals recognized in its opinion on direct appeal affirming Hall's capital murder conviction and death sentence, the circumstances surrounding the murder of Clarene Haskew `reflect those of a mature individual.' Hall, 820 So.2d at 148-150. Given the heinous nature of the crime, the facts surrounding the crime, and his prior convictions, this Court finds that the fact that Hall was 21 years old at the time of the offense would not have changed this Court's finding that the statutory mitigating circumstance pertaining to the age of the defendant at the time of the crime does not exist in this case.
"Because the fact that Hall was actually 21 years old when he committed the murder of Clarene Haskew does not change this Court's finding that the statutory mitigating circumstance pertaining to the age of the defendant at the time of the crime does not exist in his case, Hall cannot satisfy either the deficient performance or the prejudice prong of Strickland v. Washington, 466 U.S. 668 (1984). . . .
". . . .
"Even if Hall's counsel had objected to this Court's finding that he was 22 years old at the time of the crime, their objection would not have caused this Court to change its finding that the statutory mitigating circumstance pertaining to the age of the defendant at the time of the offense does not exist in his case. Because such an object[ion] would not [have] changed this Court's finding, this Court cannot find that his trial counsel were ineffective for failing to raise that objection. For that reason, Hall cannot satisfy either the deficient performance or the prejudice prong of Strickland v. Washington, 466 U.S. 668 (1984). This claim is denied."
(C.R. 734-37.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this allegation.

C.
Third, the appellant contends that his trial attorneys rendered ineffective assistance because they did not object to several instances of what he claims was prosecutorial misconduct.

1.
The appellant asserts that his trial attorneys rendered ineffective assistance because they did not object on the ground that the prosecutor misstated the definition of reasonable doubt during his closing argument.
On direct appeal, this court stated:
"Hall alleges that the prosecutor misstated the law concerning reasonable doubt. Hall complains that the prosecutor stated that reasonable doubt is `a doubt for which you can give a particular reason after considering all of the evidence' and that this definition raised the level of doubt needed for an acquittal.
"The trial court instructed the jury that arguments of counsel were not evidence, and it gave a detailed instruction on reasonable doubt. Certainly, the prosecutor's comment concerning the definition of reasonable doubt, which was not an incorrect statement of the law, did not `so infect the trial with *169 unfairness' that Hall is entitled to a new trial. Darden v. Wainwright, supra."
Hall, 820 So.2d at 141-42.
Also, in its order denying the petition, the circuit court stated:
"Hall was granted an evidentiary hearing on the claims in his amended Rule 32 petition, but he failed to present any evidence or argument in support of this claim at his Rule 32 hearing. . . . Rule 32.3 of the Alabama Rules of Criminal Procedure places the burden of proof squarely on the petitioner in a postconviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. For that reason, this claim is denied."
(C.R. 718.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Because the appellant did not present any evidence in support of this allegation, he did not satisfy his burden of proving that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. See Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland. Therefore, he is not entitled to relief on this allegation.

2.
The appellant also asserts that his trial attorneys rendered ineffective assistance because they did not object on the ground that the prosecutor allegedly "told the jury that the only sentence for this case was death." (Appellant's brief at p. 47.)
On direct appeal, this court stated:
"The next challenged remark was the following comment made in closing argument:
"`Some people turn out bad and some turn out good. Steve Hall is bad. And the law has a way of dealing with people like that. The law has a way of dealing with people who are evil, who are cruel, who will take a defenseless, pitiful, harmless, 69-year-old woman and beat her and drag her. And that's not the actions of one man. You can look at the evidence and see the things that were done to her. They shoot her in the back of the head twice. And then what do they do? Then what do they do? They deface her house. They tear up her house. They take items of close personal value with her  with them. They made their own choice. Steve Hall made his own choice. And his choice was murder, intentional murder during the course of burglary. An atrocious, heinous, cruel crime that deserves only one punishment. And that's the death penalty.'
"Hall argues that the above comment created a presumption in favor of the death penalty. We do not agree. The State has the burden of proving that the aggravating circumstance that the murder was especially heinous, atrocious, or cruel applied to the case. Also, the State has the burden of proving that the aggravating factors outweigh the mitigating ones and mandate a sentence of death. This argument went directly to the State's burden of proof; it did not amount to error."
Hall, 820 So.2d at 143-44.
Also, in its order denying the petition, the circuit court stated:
"Hall was granted an evidentiary hearing on the claims in his amended Rule 32 petition, but he failed to present any evidence or argument in support of this claim at his Rule 32 hearing. . . . Rule 32.3 of the Alabama Rules of Criminal *170 Procedure places the burden of proof squarely on the petitioner in a postconviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. For that reason, this claim is denied."
(C.R. 724-25.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Because the appellant did not present any evidence in support of this allegation, he did not satisfy his burden of proving that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. See Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland. Therefore, he is not entitled to relief on this allegation.

3.
Finally, the appellant asserts that his trial attorneys rendered ineffective assistance because they did not object on the ground that the prosecutor "improperly implied Satanism in order to inflame and prejudice the jury." (Appellant's brief at p. 49.)

a.
The appellant alleges that "[t]he prosecutor made improper statements to the media in order to taint the jury pool." (Appellant's brief at p. 49.)
On direct appeal, this court stated:
"Hall also argues that he was denied a fair trial because of the prosecutor's allegedly improper and highly prejudicial extrajudicial statements to the media. Specifically, he contends that the district attorney violated Rule 3.6, Ala. R. Prof. Cond., by commenting to the press shortly after Hall's arrest that Hall had a prior record, that satanic symbols had been spray painted on the walls of Haskew's home, and that if Hall and Travis were lucky enough to survive their injuries he would see that they were executed.
"As the State argues in its brief to this Court that, even if we were to find that the district attorney violated the Rules of Professional Conduct, we would find no violation of Hall's right to a fair trial. As this Court stated in Whisenhant v. State, 555 So.2d 219 (Ala.Cr.App. 1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943 (1990):
"`This appellant alleges that the attorney general's pretrial press conference constituted prosecutorial misconduct which denied this appellant of due process. The appellant alleges that this press conference violated a long standing injunction and violated the Code of Professional Responsibility of the Alabama State Bar, specifically, Disciplinary Rule 7-107.
"`In reviewing this appellant's allegations of prosecutorial misconduct, this court finds that the appellant was not deprived of due process nor prejudiced in any way. The prospective jurors were polled by the trial judge prior to the jury selection process. The judge asked, "Is there any member of the jury who thinks because of the recollection that you may have about this case, whether it be from radio, television or newspaper, that it would be impossible for you to sit as a fair and impartial juror in the penalty stage of this case? That is[,] what you have read, what you have seen or heard on television, would that in any way bias or affect you in any way from rendering a fair and impartial verdict in this case. If you feel that it would simply raise your hand." All jurors who raised their hands were excused.

*171 "`In reviewing the record, we find that the trial judge carefully considered this matter while hearing the appellant's motion for change of venue. There was no abuse of discretion by the trial court, and the appellant was not deprived of a fair and impartial trial. Thus, the trial court properly denied the appellant's motion for change of venue in which it considered the prejudicial effects of the news conference in question. See Robinson v. State, [430 So.2d 883 (Ala.Cr.App. 1983)]; Acoff v. State, [50 Ala.App. 206, 278 So.2d 210 (1973)]; Botsford v. State, [54 Ala.App. 482, 309 So.2d 835 (1975)]; Nelson v. State, [440 So.2d 1130 (Ala.Cr.App.), cert. denied, 440 So.2d 1130 (Ala.1983)].'
"555 So.2d at 224-25.
"As previously noted the voir dire examination was extensive. The panels were questioned about media coverage surrounding the case. Each prospective juror indicated that he or she could base his or her decision on the evidence presented at trial. No violation of Hall's constitutional rights occurred here."
Hall, 820 So.2d at 136 (footnote omitted).
Also, in its order denying the petition, the circuit court stated:
"Hall was granted an evidentiary hearing on the claims in his amended Rule 32 petition, but he failed to present any evidence or argument in support of this claim at his Rule 32 hearing. . . . Rule 32.3 of the Alabama Rules of Criminal Procedure places the burden of proof squarely on the petitioner in a post-conviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. For that reason, this claim is denied."
(C.R. 728.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Because the appellant did not present any evidence in support of this allegation, he did not satisfy his burden of proving that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. See Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland. Therefore, he is not entitled to relief on this allegation.

b.
The appellant also alleges that the prosecutor "engaged in improper argument at the penalty phase of the trial . . . and attempted to inflame and prejudice the jury with improper remarks concerning satanism." (Appellant's brief at p. 49.) Specifically, he argues that "the prosecutor, in an attempt to enrage the jury, made implications of satanism during closing arguments. He stated: `[A] crime that has the most evil . . . facts . . . [a] night of horror . . . [a] night of absolute hell.' (R. 8267.)" (Appellant's brief at p. 49.)
In its order denying the petition, the circuit court found:
"In his amended petition, Hall directs this Court to page 8267 of the trial record, and he alleges that the prosecutor's remarks on that page indicate that he attempted to enrage the jury by implying Satanism during the State's penalty phase closing argument. (Amended Pet. at 60.) Hall is very much mistaken. The prosecutor did not imply Satanism. Instead, the remark in question occurred in the following context:
"`Mr. Chapman: . . . They want to blame it on Wayne Travis. I want you to follow the evidence in the case. The evidence is that Mr. Hall stands before you a convicted cold-blooded murderer. A murderer of a crime *172 that has the most evil, most despicable facts and evidence you can think about. A night of horror. A night of absolute hell for Clarene Haskew.'
"(R. 8267.)
"It is well-settled in Alabama that the prosecutor has the right to present his or her impressions from the evidence and may argue every legitimate inference that can be reasonably drawn from the evidence. See, e.g., Wilson, 874 So.2d at 1163; Melson, 775 So.2d at 887.
"Having thoroughly reviewed the trial record, this Court finds that the prosecutor's comments during the State's penalty phase closing argument in no way implied Satanism. Instead, the trial record reflects that the prosecutor simply was presenting his own impression of the evidence that was presented during Hall's trial. (R. 8267.) The prosecutor's remark that the victim, Clarene Haskew, experienced a `night of absolute hell' on the night of her murder in no way implied Satanism.
"Because the underlying substantive claim is refuted by the trial record, Hall cannot satisfy either the deficient performance or the prejudice prong of Strickland v. Washington, 466 U.S. 668 (1984). Accordingly, this claim is denied."
(C.R. 729-30.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief on this allegation.

D.
Fourth, the appellant contends that his trial attorneys rendered ineffective assistance because they did not object to numerous errors at trial and on direct appeal to this court. As a result, he asserts that he was subjected to the more onerous plain error standard of review rather than review for reversible error.

1.
The appellant alleges that this court reviewed seven claims for plain error on direct appeal because counsel did not raise them at trial. In its order denying the petition, the circuit court found:
"This claim is summarily dismissed by this Court because it does not satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. In his amended petition, Hall sets forth the bare assertion that seven of his claims were reviewed for plain error on appeal because his counsel failed to raise the necessary objections during his trial to ensure that those claims would be reviewed under a less onerous standard of review, and he just lists those claims in his petition. (Amended Pet. at 92-97.) He does not even attempt to discuss any of those claims or explain why he believes that he would have obtained relief on those claims if they had been reviewed under a different standard. In addition, he does not explain how the outcome of his case would have been affected if those claims had been reviewed under a less onerous standard of review on appeal, as is required by Strickland v. Washington, 466 U.S. 668 (1984). `Conclusory allegations not supported by specifics do not warrant relief.' Thomas [v. State], 766 So.2d [860,] 889 [(Ala.Crim.App.1998)]. Rule 32.6(b) of the Alabama Rules of Criminal Procedure provides that `[a] bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.' This claim fails to comply with the specificity and full factual pleading requirements of Rules 32.3 *173 and 32.6(b) of the Alabama Rules of Criminal Procedure. For that reason, this claim is summarily dismissed, under Rule 32.7(d) of the Alabama Rules of Criminal Procedure.
"In the alternative, Hall was granted an evidentiary hearing on the claims in his amended Rule 32 petition, but he failed to present any evidence or argument in support of this claim at his Rule 32 hearing. Attorneys McMillan and Brown represented Hall at trial and during his direct appeal in the Alabama Court of Criminal Appeals and in the Supreme Court of Alabama. In other words, they were his trial counsel and his appellate counsel. Although Hall called them to testify at his Rule 32 hearing, he did not ask them any questions about their representation of him on direct appeal. Moreover, Hall could have, but did not, ask them about the seven claims that he lists in this portion of his amended petition. . . . Rule 32.3 of the Alabama Rules of Criminal Procedure places the burden of proof squarely on the petitioner in a post-conviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. This claim is denied."
(C.R. 738-40.) The record supports the circuit court's findings, and we adopt them as part of this opinion. The appellant made bare, conclusory assertions concerning this allegation, and he did not present any evidence in support of it. Therefore, he did not satisfy his burden of pleading and proving that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. See Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland. Accordingly, he is not entitled to relief on this allegation.

2.
The appellant alleges that his attorneys raised numerous issues in his brief to the Alabama Supreme Court that they did not raise before this court. In its order denying the petition, the circuit court found:
"This claim is summarily dismissed by this Court because it does not satisfy the specificity and full factual pleading requirements of Rule 32.3 and Rule 32.6(b) of the Alabama Rules of Criminal Procedure. In his amended petition, Hall sets forth the bare assertion that his appellate counsel were ineffective for failing to raise [numerous] claims in the Alabama Court of Criminal Appeals, and he just lists those claims in his petition. (Amended Pet. at 98-100.) Hall does not even attempt to discuss any of those claims or explain why he believes that he would have obtained relief on those claims if they had been raised in the Alabama Court of Criminal Appeals. In addition, Hall does not explain how the outcome of his case would have been affected if those claims had been raised in the Alabama Court of Criminal Appeals, as is required by Strickland v. Washington, 466 U.S. 668 (1984). `Conclusory allegations not supported by specifics do not warrant relief.' Thomas, 766 So.2d at 889. Rule 32.6(b) of the Alabama Rules of Criminal Procedure provides that `[a] bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.' This claim fails to comply with the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. For that reason, this claim *174 is summarily dismissed, under Rule 32.7(d) of the Alabama Rules of Criminal Procedure.
"In the alternative, Hall was granted an evidentiary hearing on the claims in his amended Rule 32 petition, but he failed to present any to evidence or argument in support of this claim at his Rule 32 hearing. Attorneys McMillan and Brown represented Hall at trial and during his direct appeal in the Alabama Court of Criminal Appeals and in the Supreme Court of Alabama. Although he called them to testify at his Rule 32 hearing, Hall did not ask them any questions about their representation of him on direct appeal. Plainly, Hall could have asked them why they did not raise the . . . claims in question on direct appeal in the Alabama Court of Criminal Appeals, but he did not do so. . . . Rule 32.3 of the Alabama Rules of Criminal Procedure places the burden of proof squarely on the petitioner in a post-conviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. This claim is denied."
(C.R. 741-43.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Again, the appellant made bare, conclusory assertions concerning this allegation, and he did not present any evidence in support of it. Therefore, he did not satisfy his burden of pleading and proving that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. See Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland. Accordingly, he is not entitled to relief on this allegation.

E.
Fifth, the appellant contends that his trial attorneys rendered ineffective assistance because they did not adequately investigate the State's case and prepare a defense. In his amended petition, he simply asserted the following:
"Trial counsel failed to investigate adequately and prepare a defense of Mr. Hall. Defense counsel is under an obligation to investigate thoroughly any criminal case, and this duty is heightened in the context of a capital proceeding where a person's life is at stake. Gregg v. Georgia, 428 U.S. 153 1976). `At the heart of effective representation is the independent duty to investigate and prepare [the client's case].' Goodwin v. Balkcom, 684 F.2d 794, 805 (11th Cir.1982). In order to prepare effectively for a capital trial, counsel must investigate every possible avenue, investigate and challenge all assertions by the State and subject the State's case to rigorous examination and testing. Strickland v. Washington, 466 U.S. 668 (1984); Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir.1986) (ineffective assistance of counsel found where defense failed to interview all potential alibi witnesses); Wade v. Armontrout, 798 F.2d 304, 306 (8th Cir.1986) (ineffective assistance of counsel where defense did `not investigate the prosecution's case, [and did] not investigate . . . defense witnesses'); Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir.1985) (`A substantial body of . . . case law insists . . . that effective counsel conduct a reasonable amount of pretrial investigation) (citations omitted). While trial counsel received funds for an investigator, funds were insufficient. See supra Issue I, A. Trial counsels' performance prejudiced Mr. Hall by allowing the State to present its version of the crime virtually unchallenged. See Strickland, 466 U.S. at 686.".
*175 (C.R. 308-09.)[3]
In its order denying the petition, the circuit court found:
"This claim is summarily dismissed because it does not satisfy the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. In Thomas [v. State], 766 So.2d [860,] 892 [(Ala.Crim.App.1998)], the Alabama Court of Criminal Appeals held that `claims of failure to investigate must show with specificity what information would have been obtained with investigation, and whether, assuming the evidence is admissible, its admission would have produced a different result.' In his amended petition, Hall merely sets forth the following bare assertion: `Trial counsel failed to investigate adequately and prepare a defense of Mr. Hall.' (Amended Pet. at 8.) There is absolutely no discussion of this claim in his petition. Hall does not explain how his trial counsel's investigation of the State's case was not `adequate,' and he does not proffer what more his counsel should have done to investigate the State's case. In fact, Hall does not even attempt to support his assertion that his trial counsel failed to `prepare a defense.' In addition, Hall does not proffer how the outcome of his case would have been different if his trial counsel had `adequately' investigated the State's case, as is required by Strickland v. Washington, 466 U.S. 668 (1984). `Conclusory allegations not supported by specifics do not warrant relief.' Thomas, 766 So.2d at 889. Rule 32.6(b) of the Alabama Rules of Criminal Procedure provides that `[a] bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.' This claim fails to comply with the specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure. For that reason, this claim is summarily dismissed, under Rule 32.7(d) of the Alabama Rules Criminal Procedure.
"In the alternative, Hall was granted an evidentiary hearing on the claims in his amended Rule 32 petition, but he failed to present any evidence or argument in support of this claim at his Rule 32 hearing. . . . Rule 32.3 of the Alabama Rules of Criminal Procedure places the burden of proof squarely on the petitioner in a post-conviction proceeding. Because he did not present any evidence or argument on this claim, Hall failed to satisfy his burden of proving deficient performance and prejudice, under Strickland. For that reason, this claim is denied."
(C.R. 645-47.) The record supports the circuit court's findings, and we adopt them as part of this opinion. The appellant made bare, conclusory assertions concerning this allegation, and he did not present any evidence in support of it. Therefore, he did not satisfy his burden of pleading and proving that his trial attorneys rendered deficient performance in this regard and that that allegedly deficient performance prejudiced him. See Rules 32.3 and 32.6(b), Ala. R.Crim. P., and Strickland. Accordingly, he is not entitled to relief on this allegation.

F.
Sixth, the appellant contends that his trial attorneys rendered ineffective assistance due to allegedly inadequate compensation. To the extent he challenges the statutory limit on attorney fees in capital *176 cases, his argument is procedurally barred pursuant to the provisions of Rule 32.2(a), Ala. R.Crim. P.
To the extent the appellant raises an ineffective-assistance-of-counsel claim, he makes only bare, conclusory allegations that he has not supported with facts and evidence. During the evidentiary hearing, he did not specifically question his trial attorneys about how the limitations hindered them in representing him. At most, in response to questioning about why he did not personally interview the appellant's family members, Brown referred to the limits on compensation and to trying to be economical. However, for the reasons set forth in Part I.B.3. of this opinion, we conclude that counsel's mitigation investigation and presentation were not deficient. The appellant has not alleged a single act or omission on the part of his trial attorneys that he believes was the result of his counsel's compensation or that he believes constituted deficient performance. Therefore, he has not satisfied his burden of pleading and proof pursuant to Rules 32.3 and 32.6(b), Ala. R.Crim. P. Accordingly, he is not entitled to relief on this allegation.

G.
Finally, the appellant contends that the circuit court erred in not considering his ineffective-assistance claims cumulatively. Even assuming that this argument is properly before this court, it is without merit. In Coral v. State, 900 So.2d 1274, 1284 (Ala.Crim.App.2004), we stated:
"Coral also argues in this section of his brief that `[a]s long as some portions of the claim meets the sufficiency requirements of Rule 32, there is no rationale for the argument that other portions of the claim do not.' (Coral's brief, at p. 26.) However, the claim of ineffective assistance of counsel is a general allegation that often consists of numerous specific subcategories. Each subcategory is a independent claim that must be sufficiently pleaded. As the Supreme Court of Pennsylvania stated in Commonwealth v. Lambert, 568 Pa. 346, 797 A.2d 232 (2001):
"`[S]peaking in the context of "layered" ineffectiveness claims, . . . although some latitude may be afforded in the pleadings, PCRA [Post Conviction Relief Act] counsel generally "must, in pleadings and briefs, undertake to develop, to the extent possible, the nature of the claims asserted with respect to each individual facet of a layered ineffectiveness claim . . . "'
"568 Pa. at 364, 797 A.2d at 242 (quoting Commonwealth v. Williams, 566 Pa. 553, 566-67, 782 A.2d 517, 525 (2001) (emphasis omitted)). See also Bracknell, supra."
Therefore, the circuit court did not err in considering each ineffective-assistance claim individually.
Moreover, it appears that the circuit court did consider the appellant's ineffective-assistance claims cumulatively. In the conclusion of its order denying the petition, the circuit court stated: "This Court has reviewed each of Petitioner Hall's claims individually and cumulatively and found no error." (C.R. 743.)
Finally, we have reviewed the appellant's ineffective-assistance claims both individually and cumulatively. Based on that review, we conclude that he is not entitled to relief on those claims.

II.
The appellant also argues that the circuit court erred in finding that several of his claims were procedurally barred. The following claims are precluded pursuant to Rules 32.2(a)(3) and (5), Ala. *177 R.Crim. P., because the appellant could have raised them at trial and on appeal, but did not:
1) the appellant's constitutional rights were violated when the State presented inconsistent theories at Travis' trial and his trial;
2) Alabama's death penalty statute does not provide the weight courts must give to the jury's sentencing recommendation; and
3) the trial court did not instruct the jury that it could vote for imprisonment for life without the possibility of parole if the aggravating and the mitigating circumstances were equally balanced.
The following claims are precluded pursuant to Rules 32.2(a)(2)-(5), Ala. R.Crim. P., because the appellant raised them in part and the court addressed them in part on direct appeal, or he could have raised them in part and the court could have addressed them in part at trial and on direct appeal but did not:
1) the prosecutor eliminated jurors based on race, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); and
2) the trial court erred because it did not change venue a second time.
The following claim is precluded pursuant to Rules 32.2(a)(2) and (5), Ala. R.Crim. P., because the appellant raised it and the trial court addressed it at trial, and he could have raised it and the court could have addressed it on appeal but did not:
1) the trial judge violated his constitutional rights by not recusing himself from presiding over the trial.
Finally, the appellant argues that
1) the Alabama capital murder statute denies a defendant the right to have the jury determine facts that increase the sentence to death; and
2) the jury did not specify the aggravating circumstance(s) it found to exist.
However, the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), do not apply retroactively to cases pending on collateral review. See Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004); McWilliams v. State, 897 So.2d 437 (Ala. Crim.App.2004), overruled on other grounds by Ex parte Jenkins, 972 So.2d 159 (Ala.2005); Boyd v. State, 913 So.2d 1113 (Ala.Crim.App.2003); Sanders v. State, 815 So.2d 590 (Ala.Crim.App.2001). Moreover, this court and the Alabama Supreme Court have recently addressed and rejected the same or similar arguments. See Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005). Therefore, the appellant's argument is also without merit.
For these reasons, the circuit court properly denied relief as to these claims, and we need not address the propriety of the circuit court's finding that the claims were precluded pursuant to Rules 32.2(a)(3) and (5), Ala. R.Crim. P. See Sumlin v. State, 710 So.2d 941 (Ala.Crim. App.1998) (holding that we will affirm a circuit court's denial of a Rule 32 petition if it is correct for any reason).

III.
Finally, the appellant argues that the circuit court erred because it did not grant his discovery motions before it conducted the evidentiary hearing. On August 3, 2004, he filed a "Motion for Discovery of Institutional Records, Files and Information" and a "Motion for Discovery of Prosecution Files, Records, and Information." At the beginning of the evidentiary *178 hearing on August 15, 2005, the following occurred:
"[APPELLANT'S COUNSEL]: Also there's two outstanding issues on some discovery that we had filed on August the 3rd, I believe it was. We filed a Motion for Discovery for the Prosecution's Files and a Motion for Discovery entered for Institutional Records and Files and Information. And no ruling has been issued on those two motions, and those records have not yet been produced 
"THE COURT: Oh, really.
"[APPELLANT'S COUNSEL]:  hence there is no ruling on it. So we do want to let you know that we have those outstanding and, just for the record, want to formally put in 
"THE COURT: I could have easily dealt with that if you'd have called my office and said, `I want you to schedule a hearing on those motions.'"
(R. 16-17.)
Initially, we note that "[t]he duty to monitor the status of a case necessarily includes the duty to ensure that the circuit court acts on motions that are filed with the court." Ingram v. State, [Ms. CR-03-1707, September 29, 2006] ___ So.2d ___, ___ (Ala.Crim.App.2006). Based on the record before us, it appears that the appellant waited over one year to attempt to obtain a ruling on the discovery motions.[4] Therefore, we question whether he diligently pursued his discovery requests.
Moreover, in Ex parte Land, 775 So.2d 847, 852-53 (Ala.2000), the Alabama Supreme Court held:
"We agree with the Court of Criminal Appeals that `good cause' is the appropriate standard by which to judge post-conviction discovery motions. In fact, other courts have adopted a similar `good-cause' or `good-reason' standard for the postconviction discovery process. See [State v.] Marshall, [148 N.J. 89, 690 A.2d 1 (1997)]; State v. Lewis, 656 So.2d 1248 (Fla.1994); People ex rel. Daley v. Fitzgerald, 123 Ill.2d 175, 121 Ill.Dec. 937, 526 N.E.2d 131 (1988). As noted by the Illinois Supreme Court, the good-cause standard guards against potential abuse of the postconviction discovery process. See Fitzgerald, supra, 123 Ill.2d at 183, 121 Ill.Dec. 937, 526 N.E.2d at 135. We also agree that New Jersey's Marshall case provides a good working framework for reviewing discovery motions and orders in capital cases. In addition, we are bound by our own rule that `an evidentiary hearing must be held on a [petition for postconviction relief] which is meritorious on its face, i.e., one which contains matters and allegations (such as ineffective assistance of counsel) which, if true, entitle the petitioner to relief.' Ex parte Boatwright, 471 So.2d 1257, 1258 (Ala.1985).
"We emphasize that this holding  that postconviction discovery motions are to be judged by a good-cause standard  does not automatically allow discovery under Rule 32, Ala. R.Crim. P., and that it does not expand the discovery procedures within Rule 32.4. Accord Lewis, supra, 656 So.2d at 1250, wherein the Florida Supreme Court stated that the good-cause standard did not affect Florida's rules relating to postconviction procedure, which are similar to ours. By adopting this standard, we are only recognizing that a trial court, upon a petitioner's showing of good cause, may exercise its inherent *179 authority to order discovery in a proceeding for postconviction relief. In addition, we caution that postconviction discovery does not provide a petitioner with a right to `fish' through official files and that it `is not a device for investigating possible claims, but a means of vindicating actual claims.' People v. Gonzalez, 51 Cal.3d 1179, 1260, 800 P.2d 1159, 1206, 275 Cal.Rptr. 729, 776 (1990), cert. denied, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 85 (1991). Instead, in order to obtain discovery, a petitioner must allege facts that, if proved, would entitle him to relief. Cf. Porter v. Wainwright, 805 F.2d 930, 933 (11th Cir.1986) ('a hearing [on a habeas corpus petition] is not required unless the petitioner alleges facts which, if proved, would entitle him to federal habeas relief'), cert. denied, 482 U.S. 918, 919, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987). Furthermore, a petitioner seeking postconviction discovery also must meet the requirements of Rule 32.6(b), Ala. R.Crim. P., which states:
"`The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.'"
Also, in Jackson v. State, 910 So.2d 797, 801-04 (Ala.Crim.App.2005), this court stated:
"Though Alabama has had little opportunity to define what constitutes `good cause,' in Ex parte Mack, 894 So.2d 764, 768 (Ala.Crim.App.2003), we quoted with approval an Illinois case the Alabama Supreme Court relied on in Land  People v. Johnson, 205 Ill.2d 381, 275 Ill.Dec. 820, 793 N.E.2d 591 (2002):
"`"A trial court has inherent discretionary authority to order discovery in post-conviction proceedings. See People ex rel. Daley v. Fitzgerald, 123 Ill.2d 175, 183, 121 Ill.Dec. 937, 526 N.E.2d 131 (1988); People v. Rose, 48 Ill.2d 300, 302, 268 N.E.2d 700 (1971). A court must exercise this authority with caution, however, because a defendant may attempt to divert attention away from constitutional issues which escaped earlier review by requesting discovery. . . . Accordingly, the trial court should allow discovery only if the defendant has shown `good cause,' considering the issues presented in the petition, the scope of the requested discovery, the length of time between the conviction and the post-conviction proceeding, the burden of discovery on the State and on any witnesses, and the availability of the evidence through other sources. Daley, 123 Ill.2d at 183-84, 121 Ill.Dec. 937, 526 N.E.2d 131; see People v. Fair, 193 Ill.2d 256, 264-65, 250 Ill.Dec. 284, 738 N.E.2d 500 (2000). We will reverse a trial court's denial of a post-conviction discovery request only for an abuse of discretion. Fair, 193 Ill.2d at 265, 250 Ill. Dec. 284, 738 N.E.2d 500. A trial court does not abuse its discretion in denying a discovery request which ranges beyond the limited scope of a post-conviction proceeding and amounts to a `fishing expedition.'"'
"894 So.2d at 768-69 (quoting Johnson, 205 Ill.2d at 408, 275 Ill.Dec. at 836-37, 793 N.E.2d at 607-08). See also State v. Lewis, 656 So.2d 1248 (Fla.1994).
"The New Jersey Supreme Court in State v. Marshall, 148 N.J. 89, 690 A.2d 1 (1997), a case also cited with approval by the Alabama Supreme Court in Land, stated:

*180 "`We anticipate that only in the unusual case will a PCR [postconviction relief] court invoke its inherent right to compel discovery. In most cases, a post-conviction petitioner will be fully informed of the documentary source of the errors that he brings to the PCR court's attention. Moreover, we note that PCR "is not a device for investigating possible claims, but a means for vindicating actual claims." People v. Gonzalez, 51 Cal.3d 1179, 275 Cal.Rptr. 729, 776, 800 P.2d 1159, 1206 (1990), cert. denied, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 85 (1991). The filing of a petition for PCR is not a license to obtain unlimited information from the State, but a means through which a defendant may demonstrate to a reviewing court that he was convicted or sentenced in violation of his rights. . . .
"`Moreover, consistent with our prior discovery jurisprudence, any PCR discovery order should be appropriately narrow and limited. "[T]here is no postconviction right to `fish' through official files for belated grounds of attack on the judgment, or to confirm mere speculation or hope that a basis for collateral relief may exist."

Gonzalez, supra, 275 Cal.Rptr. at 775, 800 P.2d at 1205; see Deputy v. Taylor, 19 F.3d 1485, 1493 (3d Cir.), cert. denied, 512 U.S. 1230, 114 S.Ct. 2730, 129 L.Ed.2d 853 (1994); State v. Thomas, 236 Neb. 553, 462 N.W.2d 862, 867-68 (1990). However where a defendant presents the PCR court with good cause to order the State to supply the defendant with discovery that is relevant to the defendant's case and not privileged, the court has discretionary authority to grant relief. See Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C.A. § 2254 Rule 6(a); [State v.] Lewis, . . . 656 So.2d [1248,] 1250 [(Fla.1994)]; [People ex rel. Daley v.] Fitzgerald, [123 Ill.2d 175, 183,] 121 Ill.Dec. [937,] 941, 526 N.E.2d [131,] 135 [(1998)] (noting that "good cause" standard guards against potential abuse of PCR discovery process).'
"Marshall, 148 N.J. at 270-71, 690 A.2d at 91-92.
"The federal courts have adopted a similar standard for discovery in relation to federal habeas corpus actions. In Murphy v. Bradshaw, [No. C-1-03-053, September 13, 2003] (S.D.Ohio 2003) (not published), an Ohio court stated:
"`A habeas petitioner is not entitled to discovery as a matter of course, but only upon a fact-specific showing of good cause and in the Court's exercise of discretion. Rule 6(a), Rules Governing § 2254 Cases; Bracy v. Gramley, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); Harris v. Nelson, 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969); Byrd v. Collins, 209 F.3d 486, 515-16 (6th Cir.2000). Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief. . . ." Bracy, 520 U.S. at 908-909, quoting Harris, 394 U.S., at 300, 89 S.Ct., at 1091. Conversely, where a petitioner would not be entitled to relief on a particular claim, regardless of what facts he developed, he cannot show good cause for discovery on that claim.'
"(Emphasis added.) `This authority [to order discovery in postconviction proceedings] must be exercised with caution, because of the potential for abuse of the discovery process and because of the limited scope of postconviction proceedings.' *181 People v. Williams, 209 Ill.2d 227, 236, 282 Ill.Dec. 824, 830, 807 N.E.2d 448, 454 (2004). `[T]he range of issues in a post-conviction proceeding is relatively narrow, and discovery requirements are correspondingly limited.' People ex rel. Daley v. Fitzgerald, 123 Ill.2d 175, 182, 121 Ill.Dec. 937, 940, 526 N.E.2d 131, 134 (1988).
". . . .
". . . In Hooks v. State, 822 So.2d 476 (Ala.Crim.App.2000), we held:
"`We agree with the State that a claim that is procedurally barred in a postconviction petition clearly is not one that entitles a petitioner to relief. If a postconviction claim does not entitle the petitioner to relief, then the petitioner has failed to establish good cause for the discovery of materials related to that claim. See Land.'
"822 So.2d at 481. `[I]f a particular claim is procedurally defaulted, no matter what facts a petitioner develops, he will not be able to show that he is entitled to relief. Therefore, there can be no good cause to allow discovery of facts underlying a procedurally defaulted claim.' Murphy v. Bradshaw, (No. C-1-03-053, September 13, 2003) (S.D.Ohio 2003) (not published)."
(Footnote omitted.)
Applying these principles, we have carefully reviewed the two discovery motions the appellant filed in this case. In the motions, the appellant requested very broad discovery of many types from many sources. However, he did not show good cause as to why the circuit court should have granted the motions. Rather, he made only bare allegations that revealed that he simply wanted to fish through the requested information to find support for his claims. Therefore, the appellant is not entitled to relief on this claim.
For the above-stated reasons, the circuit court properly denied the appellant's petition. Accordingly, we affirm the circuit court's judgment.
AFFIRMED.
McMILLAN, SHAW, and WISE, JJ., concur; WELCH, J., recuses himself.
NOTES
[1] The appellant filed a "Petitioner's Objection to the Court's Final Order and Request for Reconsideration." However, that motion was not timely filed. A motion to reconsider the denial of a Rule 32 petition must be filed within 30 days after the date of the ruling on the Rule 32 petition. See Loggins v. State, 910 So.2d 146 (Ala.Crim.App.2005). Here, the circuit court issued its order denying the petition on November 4, 2005, and the appellant filed his motion on December 9, 2005, more than 30 days later. Therefore, any arguments the appellant raised in that motion are not properly before this court.
[2] To the extent the appellant asserts that the trial court's instruction improperly created a presumption of death, his claim is precluded because he could have raised it at trial and on appeal, but did not. See Rules 32.2(a)(3) and (5), Ala. R.Crim. P.
[3] To the extent the appellant now attempts to challenge counsel's mitigation investigation, that argument is addressed in Part I.B.3. of this opinion.
[4] Although the appellant's counsel asserted during the hearing that she thought she asked for discovery during a telephone hearing, the record before us does not support such an assertion.